In Re Estate of MELISSA CONNOR, An Insane Person, by JOHN B. COLE, Her Next Friend.

### Division One, January 3, 1914.

1. **EQUITY: Jurisdiction: Measured by Bill.** The jurisdiction of a court of equity, on the question of whether or not the cause is one of equitable cognizance, is to be determined by the terms of the bill, and not by the proof.

2. ———: ———: ———: **Property Interests of Insane: Renunciation of Will.** At common law insane persons were wards of chancery, and courts exercising general common law jurisdiction in this State have not been by statute shorn of jurisdiction of matters purely equitable pertaining to the estates of insane persons. A bill which charges that the wife of a certain testator is insane; that the will does not bequeath to her a sufficient sum to provide for her care and maintenance; that she had a legal option to reject the will, and is unable to do so because of her adjudicated insanity; that the probate court and the judge thereof is opposed to her disavowal of the will; that her guardian is hostile to any renunciation of the

254 Mo. 5

In re Estate of Connor.

will, and is refusing to renounce it, although it is to her best interest that it be renounced; and that this alleged hostile attitude is a result of a conspiracy against her, filed at the instance of her brothers and sisters, she having no children, states facts sufficient to invoke the jurisdiction of a court of equity.

3. ———: ———: **Property of Insane Persons: Renunciation of Will: Probate Courts.** Probate courts are not courts of equity, and whilst in the performance of the duties devolved upon them they often administer according to equitable principles, yet of matters purely equitable they have no jurisdiction. A general control over the insane has been transferred from the circuit court to them, but there is no statute giving to them the power to hear and determine an equitable application to have the court renounce or affirm a will for a lunatic, or one to have the court appoint a suitable person to decide for the lunatic upon the matter of affirming or renouncing a will; nor do probate courts have authority to direct a guardian to either take under the will or renounce the will for the lunatic. Such matters are purely of equitable cognizance.

4. ———: ———: **To Renounce Will for Insane Widow.** A court of equity has power to renounce or to elect to affirm a will in behalf of an insane widow whose guardian is hostile to such renunciation.

5. **WILL: Renunciation of Widow: Interest of Adopted Child.** It is not necessary to determine what interest the insane widow of testator would take in his estate if his will were renounced for her by a court of equity, or how her interest would be affected by the fact that after she became insane he adopted a child by a deed executed by himself alone, where the court decrees that it will not renounce the will.

6. ———: **Renunciation: Matters to be Considered.** The right to renounce a will is one for the benefit of the widow herself, and does not take into consideration the interests or wishes of her next of kin. And whether or not a court of equity will renounce it for an insane widow depends upon all the circumstances of the case as they are made to appear to the chancellor. Financial considerations alone are not determinative; for a sane widow, knowing her husband's wishes and his understanding of his property, may elect to abide by the will, when to do so means a financial loss; and the chancellor, for the purpose of electing to affirm or renounce the will, stands for the moment for the insane widow. The value of the estate should not be the dominating element in the election; the real question is, what is for the best interest of the insane widow, due. regard being given to the husband's right to will his property, and her condition under the will?

In re Estate of Connor.

7. ———: ——— : ———: **Insane Widow: This Case.** Testator died in 1907. He was married in 1874, and since 1887 his wife had been confined in St. Vincent's Institution for the Insane, incurably insane, in the best room in the institution, and there she still remains, kindly, carefully and comfortably cared for by the Sisters of Charity. He often visited her in his lifetime, and came to thoroughly know how she was treated. He died possessed of a vast property, in value a million dollars or more. By his will he gave her the income of one hundred thousand dollars "in case she recovers her mind and health," but so long as she "remains in her present mental state then it is my will and desire that there be set apart and paid for her care, comfort and support the sum of one hundred and fifty dollars per month, and such other and further sum as it may be necessary to expend in the judgment and opinion of the Sisters of Charity of St. Vincent's Institution in St. Louis, for her comfort, care, treatment and attendance, it being my wish and desire that she shall at all times and under all circumstances have the best possible care and treatment that can possibly be had and provided; this in lieu of dower and other interest in my estate and property." He gave $200,000 to two cities, and the balance of his property he gave to his brothers and sisters; but thereafter adopting a little girl as his child, he added a codicil providing that she should share equally with the other legatees. After his death his widow was formally adjudged insane by the probate court, and the guardian being hostile to any renunciation of the will or to making an election, her next of kin applied to the circuit court to exercise its equity powers to elect for her. *Held*, that there is nothing in the facts, considering the age and hopeless insanity of the widow and the humane care she is receiving and will continue to receive at this permanent institution and at the hands of its Sisters of Charity proverbially kind and considerate, to indicate that the testator's will was not the wisest provision that could be made for her, and her interest being the paramount desideratum, the circuit court should have elected to take under the will.

8. ———: ———: **Decree: Dismissal.** Where all the interested parties are in the equity court, in a proceeding to have the court to elect for an insane widow to either renounce the will or elect to take under it, and the court is of the opinion that the will should be upheld, the decree ought not to dismiss the bill, but should elect to abide by the will.

Appeal from Jasper Circuit Court.—*Hon. D. E. Blair,* Judge.

REVERSED AND REMANDED *(with directions).*

*C. B. Chapman, Fred L. Williams, P. D. Decker, A. C. Burnett, Fred W. Kelsey* and *F. M. Cummings* for appellant.

(1) When a man dies leaving children his widow is endowed of one-third part of her husband's lands for life (Sec. 345, R. S. 1909) and a share of the personal estate equal to that of a child (Sec. 349). When a man dies leaving a widow and no children his widow is entitled to one-half of his real and personal property absolutely. Sec. 351, R. S. 1909. A person may adopt a child by deed, executed, acknowledged and recorded in the county of his residence, as in case of conveyance of real estate. Sec. 1671, R. S. 1909. A married woman, by joining with her husband, shall, with her husband, be capable of adopting a child. Sec. 1672, R. S. 1909. From the time of filing the deed of adoption with the recorder the adopted child shall have the same rights as against the adoptive parents as a natural born child. Sec. 1673, R. S. 1909. The statute providing for the adoption of children is in derogation of the common law and purely statutory, and should be strictly construed. Sarazin v. Railroad, 153 Mo. 479. The deed of adoption not being executed by Melissa Connor was void as to her. Hayworth v. Hayworth, 123 Mo. 303; Sarazin v. Railroad, 153 Mo. 479; Reindeer v. Koppelmann, 68 Mo. 482; Stanley v. Chandler, 53 Vt. 619; Barnes v. Allen, 25 Ind. 222; Kieth v. Ault, 144 Ind. 626; Markover v. Krauss, 132 Ind. 294. (2) It being to the interest of Melissa Connor to elect and she being mentally disqualified from acting, and her guardian refusing to act for her, a court of equity had such power. Under the common law a court of chancery had the special care and jurisdiction over lunatics and persons of unsound mind. Burwell on Insanity, secs. 28, 29 and 30; 22 Cyc. 1120; Nelson v. Duncombe, 9 Devon, 278; Frots v. Redford, 54 Mo. App. 346; In re Nesbit, 22 Eng. Ch. Rep. 245; 1 Spencer on Eq. Jurisprudence, p. 618; Nailor v. Nailor, 4 Dana, 340; 2

Story's Eq. Jur., sec. 1363; Pennington v. Thompson, 5
Del. Ch. 328; Corries Case, 2 Bland, 488; Penhallow v.
Kimball, 61 N. Y. 598; McCord v. Ogletree, 8 Blatch. 15.
Under the laws of Missouri a court of chancery has
the same jurisdiction that it did at common law. State
ex rel. v. Withrow, 133 Mo. 500; Sec. 4151, R. S. 1899;
Art. 6, sec. 34, Constitution; Cabiness v. Lisa, 1 Mo.
682; Clark v. Henry, 9 Mo. 333; State ex rel. v. Dear-
ing, 180 Mo. 53; Janny v. Spedden, 38 Mo. 395; Biddle
v. Ramsey, 52 Mo. 153; Meyer v. Field, 37 Mo. 434;
McGuire v. Tyler, 47 Mo. 115; Church v. Robertson, 71
Mo. 326. (3) A statutory jurisdiction, such as creat-
ing an inferior court, does not extinguish an ancient
jurisdiction when there is nothing in the statute to in-
dicate such a legislative purpose. State v. St. Louis
Co., 38 Mo. 403; Tackett v. Volzer, 85 Mo. 480; Brandon
v. Carter, 119 Mo. 572; Lackland v. Walker, 151 Mo.
262. (4) The Constitution and the statute of Mis-
souri vested in the circuit and Supreme Court of the
State the ultimate consideration of the care, oversight,
superintending control and safeguarding of the insane
(such as Melissa Connor had been adjudged to be).
Constitution, art. 6, sec. 23; R. S. 1909, secs. 3956 (4th
subdiv.), 3900, 2083. (5) The circuit court erred in
not responding to the appeal to it, when informed, as
it was informed, as to the common effort of the probate
court, Thomas Connor's executors and Melissa Con-
nor's guardians to deprive her of her marital interests
in her husband's estate, that is, by not declaring as re-
quested what her interest, if any, was and is. (6) The
court committed error in overlooking the right of
renunciation and as well the right of election of Melissa
Connor, when made by a court of equity for her, in the
absence of any act in good faith by any one of her
"legal" representatives to represent her for her best
interests and benefit as provided by law. (7) The
court committed error by overlooking the fact that the
right of renouncing the provisions of a husband's will

has been upheld by the Supreme Court, uniformly, whenever the question has been presented, whether any right of election under any particular statute existed or not. Egger v. Egger, 225 Mo. 126; Spratt v. Lawson, 176 Mo. 175.

*W. H. Phelps* and *Howard Gray* for respondents.

(1) In determining what shall be done with this case, it is important to keep in mind that the suit was not instituted in the usual or ordinary manner; that a petition was filed during the term of the court, on the theory that an extraordinary and grave condition existed, and unless the court then and there proceeded to do the things requested in the petition, the plaintiff would suffer great injury. It was then and there claimed that Thomas Connor died without issue, and that Mrs. Connor had the right to elect to take one-half of his estate, provided she filed her election to do so within twelve months, and that time would expire immediately and this right lost unless a court of equity proceeded to act without notice to the parties in interest. If no such a condition existed, and no election was necessary, then the circuit court was justified in dismissing this extraordinary proceeding and directing the parties to proceed in the usual and ordinary manner. Secs. 345, 349, R. S. 1909. To take under these sections no election is necessary. Hayden v. Hayden, 23 Mo. 398; Lich v. Lich, 138 S. W. 558; Egger v. Egger, 225 Mo. 148. The appellant maintains that Mrs. Connor had the right to elect under the provisions of section 351 to take one-half of the real and personal estate belonging to the husband at the time of his death, absolutely, but in order to get such an interest she was required to file her election within twelve months. We deny that Mrs. Connor was entitled to the provisions of section 351 because her husband did not die without "leaving a child or other descendant in being capable of inheriting." The record shows that Thomas Con-

nor several years prior to his death, adopted, by deed, executed, acknowledged and recorded, as required by section 1671, Agnes Connor, and that such child survived him, and by section 1673 this child by such deed of adoption became the lawful child of Thomas Connor and an heir to his property. Moran v. Stewart, 122 Mo. 295, 173 Mo. 207; Westerman v. Schmidt, 80 Mo. App. 344; Hockaday v. Lynn, 200 Mo. 456; Keeney v. McVoy, 206 Mo. 42. Agnes Connor was a child in being, capable of inheriting, as that term is used in section 351. Moran v. Stewart, 122 Mo. 295. Counsel for the appellants say that the rule in the Moran case does not apply here because the deed of adoption in that case was entered into previous to the marriage, while Mr. Connor did not adopt Agnes until after he had married Mrs. Connor, and even then she did not join in the deed of adoption. A complete answer is found in Green v. Green, 126 Mo. 17. (2) Not only has the court held that children of a subsequent marriage prevent the first wife from electing, but they have gone much further, and hold that where a husband has by gift or other means disposed of his property, without the wife joining, or without her consent, upon his death she cannot elect under the provisions of section 351. Hornsey v. Casey, 21 Mo. 545; Coberly v. Coberly, 189 Mo. 1; Newton v. Newton, 162 Mo. 173; Dickerson's Appeal, 115 Pa. St. 198, 2 Am. St. 547. There are only two other sections of our statute which deal with the question of election or renunciation. Section 360 provides if any testator shall by will pass any real estate to his wife, such device shall be in lieu of dower unless the testator by will otherwise declares. Section 361 provides that in such cases the wife shall not be endowed in any of the real estate of the husband unless she shall by writing executed, acknowledged, and recorded as in case of deeds for land, announce that she will not accept the provisions of her husband's will. These sections do not apply to this case because

Mr. Connor's will does not purport to give the widow any interest in lands. Hamilton v. O'Neill, 9 Mo. 11; Sparks v. Dorrell, 151 Mo. App. 173; Martien v. Norris, 91 Mo. 465. (3) Counsel for appellant cite a long list of cases, holding that the deed of adoption was void as to Mrs. Connor because she did not join in its execution, but they entirely overlook the fact that in all such cases from this State the court was dealing with the rights of the adopted child acquired from the parents not joining in the deed of adoption. Sarazin v. Railroad, 153 Mo. 479; Hayworth v. Hayworth, 123 Mo. App. 303. (4) The court was not authorized to appoint Gov. Claycomb to make the election under section 351. While the authorities are in conflict regarding the right of a court to make an election or to appoint a guardian to make one where the widow is insane, yet no authority can be found authorizing the court to appoint a commissioner or guardian to make an election under statutes where the Legislature has provided for a guardian to make the election under such statutes. While the courts hold that under certain circumstances and conditions a court of equity may make an election for an insane widow, they limit this right to cases wherein no provision is made by statute for any other person to make such election. In our State the Legislature has provided that the guardian of an insane widow may make an election under sections 351, 352, and 353, and therefore, the court was not authorized to appoint Gov. Claycomb for that purpose. Welch v. Anderson, 28 Mo. 293; Wash v. Wash, 189 Mo. 352; Price v. Woodford, 43 Mo. 247; Allen v. Harnet, 116 Mo. 287; Hyde v. Goldsby, 25 Mo. App. 29; Houx v. County, 61 Mo. 391. (5) The respondents maintain that even if it should be established on final settlement of the estate, that the executors have for distribution property of the value of a million dollars, the guardian, if he does his duty and follows the decisions of the courts in such cases, will

allow the will of Thomas Connor to stand. Young v. Boardman, 97 Mo. 181; Penhallow v. Kimball, 61 N. H. 596; State ex rel. v. Hunt, 93 N. W. 314; Van Steen-wyck v. Washburn, 59 Wis. 483; Harding v. Harding, 130 S. W. 1098; Ford v. Harrison, 62 S. W. (Tenn.) 53; Crozier's Appeal, 90 Pa. St. 386.

GRAVES, J.—The facts of this case, when stripped of all coloring matter which is usually thrown in where there is a legal struggle for a large sum of money, are few and simple. In the early seventies Thomas Connor came to Jasper county, Missouri, and as we gather it from the record was married in about 1874. By dint of good fortune he accumulated much property, in value a million dollars or more, and this is the real bone of contention here. Whilst it is true that the action of our consciences is in a way sought in the interest of one hopelessly insane, the whole record bespeaks a grab for cash, rather than an earnest and sincere appeal to a court of conscience. In 1887, Mrs. Melissa Connor was taken by her husband, Thomas Connor, to "St. Vincent's Institution for the Insane" then located in the city of St. Louis, but later removed to the county of St. Louis, but near the said city. With but one short interval, this institution has been her home from that date to the date of the trial of this cause by the chancellor below. The record shows that Mrs. Connor is insane and has been insane during all these years, and that her trouble is incurable. The record shows that her husband was very solicitous as to her welfare whilst she was being cared for at this institution, and when his end was nearing expressed his solicitude for her future care. In December, 1901, Thomas Connor executed a will, in which he provided for his insane wife thus:

"First. I will and bequeath to my beloved wife Melissa Connor the income of one hundred thousand dollars to be paid to her annually in case she recovers

her mind and health, and after her death the principal to be divided as hereinafter provided with the rest and balance of my property; but so long as my wife shall remain in her present mental state then it is my will and desire that there be set apart and paid for her care, comfort and support the sum of one hundred and fifty dollars per month, *and such other and further sum as it may be necessary to expend in the judgment and opinion of the Sisters of Charity at St. Vincents Institution in St. Louis, Missouri,* for her comfort, care, treatment and attendance, it being my wish and desire that she shall at all times and under all circumstances have the best possible care and treatment that can possibly be had and provided; this devise being in lieu of dower or other interest in my estate and property." The italics are ours.

In 1903, Mr. Connor adopted by deed a little girl, who by the deed, signed by the girl's father as the surviving parent and Thomas Connor, was to be known as Agnes Connor. The original will, after providing for the wife as above indicated, left the residue of his estate to five of his own blood relatives. After the adoption of the little girl, a codicil was added in 1903, so that the adopted girl would share equally with the relatives above named. There was also another codicil by which he devised $100,000 in Joplin Water Works Company bonds, each to the cities of Tiffin, Ohio, and Joplin, Missouri, the former the city of his birth, and the latter the city of his adoption. Mr. Connor died in San Antonio, Texas (where he had gone for his health), March 29, 1907. April 8, 1907, his wife, Melissa Connor, was formally adjudged insane by the probate court of Jasper county, Missouri, and Col. Wm. H. Phelps was appointed and qualified as her guardian. In less than a year he resigned, and at his request E. N. Perry was appointed guardian of Mrs. Connor. Neither Phelps nor Perry took any steps to disavow the will of Thomas Connor, and on the other

hand were desirous of abiding by the will. Just before the end of the year, the blood relatives, of Mrs. Connor (her sisters) became extremely solicitous about her, and notified Mr. Perry that as her guardian he had the right to elect to disavow the will of Thomas Connor, and have his ward take such part of the estate as the law would allow her. This portion they claimed to be one-half thereof. This notice was served upon Perry at Noel, McDonald county, Missouri, on April 17, 1908, and according to the view then entertained by the parties interested, the election to be made under Revised Statutes 1899, section 2939, had to be made before midnight of that day. Believing, as they had good reasons to believe, that Perry would not disclaim the will for his ward, the counsel for Mrs. Connor's relatives besought the equity side of the circuit court of Jasper county. Upon an *ex parte* hearing the circuit court appointed Hon. John B. Cole, a member of that bar, as next friend for Melissa Connor, and by order appointed Hon. S. H. Claycomb as a commissioner of the court to make an election for Mrs. Connor. Governor Claycomb by written instrument disavowed the will of Thomas Connor, and elected for Mrs. Connor, to take under the law. This order of the circuit court was made about ten o'clock p. m., and there was a race against time to get the written instrument executed by Governor Claycomb filed at Carthage before midnight. The Governor fearing that his age might be against him in the race, selected two younger and nimbler men to go to Carthage. These gentlemen succeeded in getting the instrument filed by the recorder of deeds prior to midnight and also succeeded in getting it pushed under the door of the probate court room prior to midnight. It is intimated that the probate judge was hiding out, but the trial judge in his finding of facts found against this view of the evidence, and in our view of it this subject need not be pursued. The probate judge did file it on the morning of the 18th of April. As stated above the

order made by the circuit court was made *ex parte* and without notice to any of the interested parties, but it was required that all interested parties be notified that they appear, and show cause, if any, why such preliminary order and judgment should not be made final and permanent. Later the parties did appear and the case was threshed out, and from the record on that hearing we have gleaned the facts above stated.

Upon this hearing the circuit court dismissed the bill of plaintiff and the bill of Mrs. Melissa Connor by her next friend, and vacated its former order and judgment entered as above stated. From this judgment this appeal is prosecuted. Stripped of all adornments, the record discloses a battle royal between Mrs. Connor's blood relatives upon the one side and the devisees mentioned in Thomas Connor's will on the other—the stake being something like a half million dollars in property. Other pertinent facts will be noted in the course of the opinion.

I. We are first met with the proposition that this cause is not one of equitable cognizance, and that for that reason the trial court was right in dismissing the bill. The jurisdiction of a court of equity must be measured by the terms of the bill and not by the proof. The bill may state grounds sufficient to invoke equitable relief and thereby confer jurisdiction of the cause, when the proof might fail to make
Equity Jurisdiction. out the case, and such failure would authorize the dismissing of the bill, but such would not defeat the jurisdiction. This bill charges the insanity of Mrs. Connor. It charges that the will of Thomas Connor has not sufficiently provided for her. It charges her legal option to reject the will and her inability to so reject it because of her adjudicated insanity. It charges that the probate court and the judge thereof is opposed to her disavowing the will, and that each of her guardians were opposed to dis-

avowing the will of Thomas Connor. That both the first and present guardian were hostile to any renunciation of the will, and were refusing to renounce said will for their ward, although it was to the best interest of such ward to renounce the will. The bill even charges that these alleged hostile actions were the result of a conspiracy against the ward, Mrs. Connor. We are unwilling to say that the bill in this case does not state facts sufficient to invoke the jurisdiction of a court of chancery. At common law the conscience of a court of chancery could be invoked in the interest of one who was insane. In Buswell on Insanity, sections 28 and 29, it is said:

"In England the king, as *parens patriae,* is considered to be entrusted with the protection of the persons and property of all his subjects, and to be bound in a peculiar manner to protect those who, by reason of imbecility or want of understanding, are incapable of taking care of themselves. . . .

"The right of a king to assume the care and custody of his insane subjects falls under the direction of the court of chancery, by virtue of a standing warrant to the lord chancellor under the sign-manual of the king—the royal authority being, in the contemplation of the law, thus delegated merely to avoid applications to the king in person. It follows, therefore, that the jurisdiction of the lord chancellor in lunacy is wholly distinct from his ordinary chancery jurisdiction under the Great Seal. But the fact of insanity being once determined, and custody of the lunatic and his property granted, it is considered that the functions of the king's warrant is accomplished, so that thereafter the chancellor acts, in superintending the conduct of the lunatic's custodians, not under the king's sign-manual, but by virtue of his general powers as guardian of the king's conscience."

In 22 Cyc. 1120, it is also said:

"In England the king is considered to assume the care of insane persons and their property; and the discharge of this function is committed to the lord chancellor by warrant under the sign-manual of the king. The English chancery jurisdiction in lunacy is therefore in theory distinct from the general chancery jurisdiction under the great seal, although the fact of insanity having once been adjudicated, the chancellor thereafter acts, in the superintendence of the lunatic's custodians, not under the king's sign-manual, but by virtue of his general equity powers."

1 Spence on Equity Jurisdiction, page 618, thus states the law:

"It is probable that, previously to the statute above referred to (17 Edw. II. c. 9), the care of such idiots and lunatics as the king had to take charge of, was committed to the chancellor. . . . After the court of chancery became established as a court of equitable jurisdiction, successive chancellors appear to have imported into the exercise of this special jurisdiction all the powers which they wielded as the chiefs of the court of chancery. Under the special warrant the chancellor commits the custody of the person of the lunatic to some person whose fitness has been ascertained *ex inquisitione* and orders are given for a suitable maintenance for himself and family out of his estate. But the chancellor appoints receivers or committees of the estate, not even requiring, as in the case of an infant, that a bill should be filed. The chancellor also makes many orders, and enforces them by attachment, which orders, and the manner of enforcing them, are not warranted by the sign-manual, but by the general powers of the court of chancery. The ruling principle has been to do what is for the benefit of the lunatic, without, perhaps, looking very narrowly into precedents, until a system now acted upon and well understood, has gradually grown up, which may be

more particularly noticed in the second part of this work.''

In Nailor's Children v. Nailor et al., 4 Dana, l. c. 340, the court says:

''It is unquestionable, that, in England, the chancellor exercised jurisdiction over the persons and estates of idiots and lunatics. The form of proceeding there, was by petition to the chancellor—which might be filed by the Attorney-General, or by any creditor, friend or relation of the unfortunate individual, praying for a commission of idiocy or lunacy.''

So also speaks 2 Story on Equity Jurisprudence (13 Ed.), sec. 1362, in this language:

''If the preceding views of this subject are correct, the court of chancery may be properly deemed to have had originally, as the general delegate of the authority of the crown as *parens patriae*, the right not only to have the custody and protection of infants, but also of idiots and lunatics, when they have no other guardian.''

ELLISON, J., in Frost v. Redford, 54 Mo. App. 345, thus summarizes the situation:

''In all civilized countries care of the insane has been an object of much solicitude. The pity and sympathy which finds a response in the breast of all from the first civilization has manifested itself in the promulgation of rules of law or equity devised for the protection and care of these most unfortunate of human beings. 'It seems to be granted at this day that the King as *parens patrias* hath the protection of all his subjects, and that in a more peculiar manner he is to take care of those who by reason of their inability and want of understanding are incapable of taking care of themselves.' [Idiots and Lunatics, Bacon's Abridgements.] The same eminent author also said that, 'The first paramount rule in lunacy is to provide for the personal ease and comfort of the lunatic.' From the inability of the King to give attention to these unfor-

tunates it was deputed to the chancellor, who in practice referred the case to a master to approve of a proper person to act as a committee of the person and estate of the insane person.''

Other authorities might be cited, but these suffice. It is safe therefore to say that at common law the insane were the wards of chancery. It is also safe to say that unless the courts exercising common law jurisdiction in this State have been shorn of this power by statute they likewise possess such power.

Jurisdiction of Court of Equity to Renounce Will for Insane Widow.

It is true that by the creation of probate courts the general control of the insane has been transferred from the court of equity to these courts, but it does not follow from this that all equitable cognizance over matters relating to lunatics and their interests was thus taken from the courts of equity. Probate courts are not courts of equity, and whilst they in the performance of the duties devolved upon them, often administer according to equitable principles, yet of matters purely equitable they have no jurisdiction.

The bill in equity now under consideration is one calling for the administration of nice equities, in the true sense of this term and the cases which we will cite and discuss in a succeeding section will show that courts of chancery have assumed jurisdiction upon similar facts. We know of no statute giving the probate courts of Missouri the power to hear and determine an equitable application to have the court renounce or affirm a will for a lunatic, or hear and determine an application to have that court appoint a suitable person to decide for the lunatic upon the matter of affirming or renouncing a will. Nor have these courts, in our judgment, authority to direct a guardian to either take under the will or renounce the will for the insane ward. To my mind the matter is one of purely equitable cognizance, and as such many courts throughout the country have so considered it.

Our court in Young v. Boardman, 97 Mo. l. c. 188, said that the guardian had to act on his own volition in the matter of an election for his ward, and in the matter of renouncing the will, and that the probate court could not make an order with reference thereto. We also said in that case:

"Without authority conferred by statutes upon the guardian of an insane widow, it would of course devolve upon the courts to make the election for her. [Penhallow v. Kimball, 61 N. H. 596; Van Steenwyck v. Washburn, 59 Wis. 483; Kennedy v. Johnston, 65 Pa. St. 454.]"

It is true that we have a statute in this State (R. S. 1909, sec. 355) which authorizes an election in certain instances to be made by the guardian of an insane widow, but in the case at bar the guardian was alleged to be hostile to such a course, and we think from the wording of the statute it applies to the renunciation of a will referred to in Revised Statutes 1909, section 361, because that part of the statutes, which was an amendment to the older statute, says:

"And in all cases when any widow entitled to the benefit of election under this article shall be of unsound mind or a minor, the lawful guardian of such person may elect for his said ward, in the same manner and with like effect as said ward might do were she capable in law of so electing."

Note the words used. It says "benefit of election under this article." The article is one which contains section 361, supra, and the renunciation of a will is but the election of the widow to take under the law rather than under the will. This renunciation or election must be within twelve months. But suppose the guardian does not elect or renounce, as in this case. Or suppose it can be said that by refusing to do either he has elected for his ward to accept the terms of the will, is there no remedy? If prompted by a wrong motive, as

charged here, the guardian by even nonaction could be said to have elected to stand by the will, then there should be some remedy in equity, there being no adequate remedy at law. In other words, a guardian cannot wrongfully act or wrongfully refuse to act without there being some remedy.

We conclude that the circuit court was possessed of jurisdiction, as a court of equity, to hear and determine the case at bar, and the only question is whether it was rightfully determined upon the facts in evidence. It makes no difference upon what theory *nisi* the bill was dismissed, if under the facts it was properly dismissed. This question we take up later.

II. Nor are we impressed with the idea that it is necessary for us, in this case, to discuss what effect, if any, the adoption of Agnes Connor, by Thomas Connor, had upon the rights of the insane widow. Upon this point it is insisted that Agnes Connor having been adopted by a deed signed by Thomas Connor alone, the wife's interest in the estate remains as though no child had been adopted by Mr. Connor. Counsel frankly admit that the language of some of our cases is against them, but undertake to argue the proposition on principle. We do not deem this question of such vital interest in the instant case to follow the many ramifications of counsel's elaborate argument. We think the petition, being one in equity, is broad enough to entitle Mrs. Connor, by her next friend, to have all her rights determined, whether such rights exist by virtue of the one statute or of the other. As stated above the right to renounce a will is nothing more than an election not to take under the will. In this case the guardian of Mrs. Connor has been and is proceeding in recognition of the will. Not only so, but the evidence in the record indicates that it is his purpose to proceed to recognize the binding effect of the will. We are of opinion that it should be determined in this case, whether or not the

estate of Mrs. Connor. in her husband's estate, should be circumscribed by the terms of the will, and whether or not a court of conscience should make or have made for her a renunciation of this will. Upon the vital question the effect of the deed of adoption is not material. We, therefore, in the succeeding paragraph, discuss what we deem the real question in this case, i. e., should a court of equity permit the will of Thomas Connor to stand, or should such court elect for Mrs. Connor to renounce the same, and permit her to take under the law? All interested parties are before the court, and this vital matter should be determined and set at rest, to the end that the estate may be fully administered and within the proper time.

III. By the preceding paragraph we have indicated that notwithstanding our statute which authorizes the guardian of an insane widow to elect, yet under the facts in this case, i. e., the expressed disposition of the guardian to take no steps other than to abide the terms of the will, there is room for a determination by a court of conscience. Cases from this State discussing this statute are not in point, because unlike in facts. This exact question has never been presented to or decided by this court. It being considered that the trial court had the right to determine the issues, was the action of such court in dismissing the bill right? We do not think so. That court was right in vacating its order and judgment of April 17th, but it should have passed upon the merits of the bill. Whilst the law gives the widow, whether sane or insane the right to renounce the will of the husband under given conditions, this right is one for the benefit of the widow herself and does not take into view the rights, if any, of her next of kin. It is hard to formulate any fixed rule in the case of an insane widow. Just what should be done for her is dependent upon all the circumstances of the case as such circumstances are made to appear to the

chancellor, who for the time being stands for her. The sane widow might not renounce a will although pure property interests might prompt her so to do. She is prompted generally by higher motives, and her action may be measured by many considerations beyond the mere passing of property. From the long years of association with the husband she may know and understand his will, and elect to abide by it, when to do so would be a financial loss. This, among other things, makes the fixing of a definite rule in the case of the insane widow a hard proposition. Upon general lines the Kentucky court in Harding's Adm'r v. Harding's Ex'r, 140 Ky. l. c. 281, says:

"The right attaches at the time the will is probated to the person of the devisee, and lives if he does during the period within which it may be exercised, and within this time he may make the election if capable of doing so, or if incapable, but living, the chancellor may make it for him. [In re Estate of Andrews, 92 Mich. 449, 17 L. R. A. 296; Nailor v. Nailor, 4 Dana, 339; Bonnie v. Haldeman, 31 Ky. Law Rep. 522; Van Steenwyck v. Washburn, 59 Wis. 483, 48 Am. Rep. 532; Wright v. West, 2 Lea (Tenn.), 78, 31 Am. Rep. 586; Page on Wills, page 719.] But, when the right of election accrued, the husband was dead, and therefore the question of his insanity cannot affect the decision of the case. The right of election did not come into being until the will was probated, because not until then was there anything in existence that the right could act upon. The will had no operative effect until it had been probated."

The case also holds that the right to renounce under a statute giving that right is a personal right, and if the party is sane the courts cannot interfere with the right. On the same page it is said:

"On the other hand, if the devisee who is not disabled by youth or infirmity does not choose to renounce the will, neither the court, a creditor, nor any other per-

son can compel him to do so or make the election for him. This was expressly decided in Bottom v. Fultz, 124 Ky. 302, 30 Ky. Law Rep. 479. There a creditor of the devisee Bottom sought to have the court to require him to elect whether he would take under the will of his wife or take the interest given him by law in her estate. In denying the creditor this relief, the court said: 'This is a personal privilege given to the husband, and it is one which he may exercise or not at his pleasure; and we are of opinion that the court could not require of appellant Bottom that he exercise that right.' In Bains v. Globe Bank & Trust Co., 136 Ky. 332, the court again considered this question, and said: 'The husband, like any other devisee, is given by the statute the election to take under the will or not, but the chancellor will not for the benefit of his creditors control him in exercising his discretion in this matter.' As the court for the benefit of creditors or other persons cannot require a devisee to elect to renounce the devise, we are unable to perceive any good reason why the personal representative of the devisee should be permitted to do so for the benefit of the heirs or creditors of the devisee. It might be very beneficial to a creditor to compel a living devisee to disclaim a devise and take under the statute of descent; and so it might be to the interest of the heirs of a deceased devisee to allow his personal representative to exercise this privilege. · But there is no more reason for permitting it to be done in one case than in the other. In neither instance would the election be made by the devisee, but by others who expected to benefit by it.''

In case of insane persons having a will renounced by a court of equity it is not necessarily a question of mere pecuniary advantage, but the real question is what is the best interest of the insane party, due regard being given to the husband's right to will his property, and the condition of the insane beneficiary under the

will. Thus in Penhallow v. Kimball, 61 N. H. l. c. 597, it is said:

"A husband's right to dispose of his estate by will is limited by his widow's right to waive any provisions in her behalf, and to take under the statute. The right to elect to take under the will or under the statute is given to her, and not to those who may inherit from her. The right does not pass to her representatives at her decease. *It is not necessarily a question of mere pecuniary advantage.* Her knowledge of the family arrangements and of the motives and wishes of her husband, and other considerations better known and appreciated by her, may have weight and influence with her in determining her election. [Pinkerton v. Sargent, 102 Mass. 568.] In that case the widow was insane."

And on pages 597 to 599 it is further said:

"A waiver of the provisions of her husband's will signed by herself, also a waiver signed by her guardian, were seasonably filed. The privilege of waiver was held to be a personal right which cannot be exercised by the widow if insane, nor by her guardian in her behalf. [See, also, Lewis v. Lewis, 7 Ired. (N. C.) 72.] In Kennedy v. Johnston, 65 Pa. St. 451, the court say, 'The election of one of two things, when only one can be chosen for the lunatic, is undoubtedly a judicial, not a ministerial act, and belongs to the court and not to the committee. The act of election settles the title, and makes that absolute which was before uncertain and optional. Where the title may attach to either of two subjects of property by election, it requires a comparison of benefits and a choice to settle the title upon one of them absolutely. This the committee undoubtedly cannot do from the provision of a mere power of management, for that implies a title already to the thing to be managed, and for the same reason the power to elect does not flow from a power to sue for and recover the property of a lunatic. It also implies

a pre-existing title in the lunatic; while the election is required to be made before title absolutely accrues. It was therefore not in the power of the committee of his own motion to relinquish the provision made for the wife in the will of her husband, and cast himself upon the dower. It was his duty to apply to the court of common pleas having jurisdiction over the person and estate of the lunatic for leave to elect the dower, which the court would grant only on due consideration of the advantages and disadvantages of the choice.' [See, also Wright v. West, 2 Lea, 78; Turner v. Street, 2 Rand. (Va.) 404; Ebrington v. Ebrington, 5 Mad. 117; Gretton v. Haward, 1 Swanst. 413.] In Crenshaw v. Carpenter, 69 Ala. 572, the question whether the chancery court possesses the power to make an election for an insane widow was left undecided. [See, also authorities cited in 2 Sto. Eq. Jur. (13 Ed.), sec. 1097, note (b), concerning election by persons under disability.]

"In England the court of chancery has the care of the persons and estates of idiots and lunatics, and in cases of election the jurisdiction is generally exercised by that court. [2 Maddock Ch. 48-60; 2 Sto. Eq. Jur., secs. 1075-1085, 1097, 1098, 1362-1365; Cauffman v. Cauffman, 17 S. & R. 16, 24-26; Kennedy v. Johnston, 65 Pa. St. 451.] When necessary the matter is referred to a master to inquire what will be most beneficial to the lunatic. The practice as to infants is the same; also as to married women in jurisdictions where their common law disabilities have not been removed. [Streatfield v. Streatfield, reported cas. temp. Talb. 176 (1 W. & T. Lead. Cas. Eq. 273); see, also, Chetwynd v. Fleetwood, 1 Bro. P. C. 300; Ashburnham v. Ashburnham, 13 Jur. 1111; Gretton v. Haward, 1 Swanst. 409, 413; 1 W. & T. Lead Cas. Eq. (Hare & Wallace's notes) 420; Addison v. Bowie, 2 Bland (Md.), 606, 623; McQueen v. McQueen, 2 Jones Eq. (N. C.) 16.]

"Equity as a branch of law has always existed as a part of the common law, in its broadest sense, in New

Hampshire. [Wells v. Pierce, 27 N. H. 503, 512; Walker v. Cheever, 35 N. H. 339; Ela v. Pennock, 38 N. H. 154, 159; Copp v. Henniker, 55 N. H. 179, 211; Truesdale v. Straw, 58 N. H. 207, 222.] This court having 'the powers of a court of equity in cases cognizable in such a court' and having the same protective jurisdiction over the persons and property of lunatics as the English court of chancery, may elect for the lunatic where the lunatic has the right of election. It has the power, and it is its duty, to protect those who have no other lawful protector. In making such election the court is guided *by considerations for the benefit of the lunatic,* without the regard to what the advantage may be to his heirs.

"If, in this case, it is found that the effect of an election to waive the provisions of the will will be to divert property from the channel in which the testator intended it to go, *and if the diversion is not required by the wants and circumstances of the widow,* the prayer of the bill cannot be granted." The italics are ours.

In the more recent case of State ex rel. Percy v. Hunt, Judge of Probate, et al., 88 Minn. 404, the court quotes with approval the rule above quoted from the New Hampshire court. In the Hunt case the lower court had elected for the widow to renounce the will, but the Supreme Court reversed such judgment and directed that the election be that she take under the will, because all the circumstances considered such was for her best interest.

In Van Steenwyck et al. v. Washburn et al., 59 Wis. 483, in which was reviewed the will of Ex-Governor Washburn, which will passed vast interests, the Wisconsin court first held that a chancery court could make an election or renunciation for an insane widow, notwithstanding the statute made no explicit provision for such widow to renounce a will, and upon the rules which should guide such a court (l. c. 507 et seq.), says:

"But upon what principles must the court proceed, or what considerations should be regarded, in making that election? The counsel for the respondents insist that the principle upon which an election is made by a court for a person under disability, is to take that property which is the most valuable. That may afford a just and proper rule upon which to proceed in most cases. But we think it would not be wise to act upon the principle in the case before us for these reasons: Governor Washburn, at the time of his death, owned large properties in the States of Wisconsin, Minnesota, and Missouri. Had he died intestate it is said his widow would have taken $600,000 or $700,000 as her share of his estate. It was assumed on the argument, and such doubtless is the fact, that the executors have set aside $5000 a year to be expended for her support. If this amount should be doubled or trebled, it is plain that the sums expended for her benefit would only be a small fraction of the share she would take by law. Mrs. Washburn was sixty-two years of age when this bill was filed. She has been insane, without a lucid interval, for more than twenty-five years. There is no ground for a rational hope or expectation that she will ever be any better. Her mind has rested too long in the deep eclipse to justify or warrant such a hope. Medical science and skill long since exhausted their resources in effort to cure her. Presumably she is incurably and hopelessly insane; and if she is ever restored to her reason, ever again clothed and in her right mind, to all human judgment that change must be brought about by an agency higher than that of man. She can have no conception of the value or use of money. If 'the wealth of Ormus and of Ind' were laid at her feet she would not distinguish it from the dust. She cannot use money; she cannot manage it; its possession would be of no earthly benefit or advantage to her. Provision is made in the will for all her wants and necessities; for medical care and attendance; for all

other care; in short, for everything which will promote her comfort and physical health. *Does not this meet the demands of every equitable requirement, so far as Mrs. Washburn is concerned?* Further, *cannot the court pay some regard to the benevolent intentions of the testator towards his kindred by blood, and those having claim on his bounty; to his munificent bequests for admirable and noble public charities, such as establishing a public library, an orphan asylum for young and destitute orphans; to the fact that he made a will in and by which he disposed of his estate in a manner which seemed to him just and right?* Is it permissible for the court to consider any of these matters, or must its discretion and judgment be limited to the sole inquiry, which property is the more valuable? It is evident if the court should elect what the law gives the widow in case of intestacy that the intentions of the testator will in a measure be defeated. Such an election would greatly interfere with the scheme of the will. Defeating a will, in any substantial provision, is much like breaking it. It is defeating it *pro tanto. The right to dispose of one's estate in accordance with his own wishes is a sacred right, which a court of equity u·uu not disregard or destroy.* The late chief justice, in Dodge v. Williams, 46 Wis. 70, says: 'Everyone should have the same power to dispose by will after his death, in accordance with his own wishes, of whatever he may leave behind him in his own sole right, as he had in life to dispose of it by contract or by gift; and it is as much the duty of courts to uphold and enforce his will after death, as to uphold and enforce his contracts made during life.' [Pages 90, 91.]

"It seems to us these considerations are entitled to some weight in making the election in this case. If the court can regard them, if it has any discretion in the matter, they should exert their due influence on our judgment. But if the court must elect for the widow the more valuable interest, without reference to any

other consideration, then it really will exercise no dis-
cretion. But we think it is the clear duty of the court
to exercise a sound discretion in the matter—to con-
sider everything having a legitimate bearing on the
election to be made. Consequently, acting upon that
principle, the court, in view of Mrs. Washburn's insane
condition, in view of the liberal and ample provision
made for her benefit in the will, and in consideration of
all the facts, does elect for her that provision as being
on the whole the best and most advantageous for her
interest and welfare." Again the italics are ours.

The lower court had elected for Mrs. Washburn
giving her that which the law gave her, and renouncing
the will. The Supreme Court for the considerations
above quoted, reversed such judgment and elected for
her to take under the will. The value of the estate was
not made the dominating influence in the election, but
all the facts and circumstances were considered. Nor
should the property interest be the dominating in-
fluence in such matters. The best interest of the
afflicted widow is the guiding star, and "the best in-
terest" does not necessarily mean the greatest amount
of property which may be obtained by an election or
renunciation. In Crozier's Appeal, 90 Pa. St. l. c. 386,
it is said:

"But the jury in the Common Pleas have found
that Mary Oles was incapable of exercising her privi-
lege of election for want of mental capacity, and how is
the case affected by this fact? It is not to be doubted,
that in this State, under the authority of Kennedy v.
Johnston, 15 P. F. Smith, 451, that whilst the court
hold that the right is personal to the widow, yet, if she
be incompetent to exercise it, it is not lost, nor shall it
fail her, but the Court of Common Pleas will advise
with her committee, elect for her, and then record the
election in the Orphans' Court. But where she dies be-
fore such election is made, how then? Is the case
changed so that the same reasons which exclude the

heir from exercising the right after the widow's decease, will not also exclude a court from doing the same thing? Is there a survivorship of the right in the one any more than in the other? Clearly not. The argument which excludes the heir, is, that the right of election does not survive the life of the elector. So long as the lunatic elector lives, the court, as guardain, is invested with the power of choice; but when the fountain dries up in death, all that has life in it dies also. In short, if no election is made by the widow during life when she is competent to act for herself, or by the court when she is not, the right is defeated in either case, the time and opportunity are past, and it never was intended that any election should be made after her death. It could do her no good and the good of others was not in the view of the lawmaker. That the law has been so understood and practised without challenge for the last century is apparent, from the fact, that a similar claim has never been made with sufficient zeal to establish a precedent.''

Again in a recent Tennessee case, Williamson v. Nelson, 62 S. W. l. c. 59, it is said:

''The policy of the law giving the widow the right to dissent is, as we think, to make just provision for her personally *and that its benefits were not intended to extend to her estate or her kinspeople after her death.* It clearly, under all the cases, as we think, requires a dissent expressly, either by the widow *or by a court for her,* during her life, to fix the status of the property, and to avoid the legal operation of the will. If this was not done before her death, then we think the property would have descended under the will, and that the administrator of the widow could take no interest in it. *We see no reason founded on public policy or natural justice and equity that would take this property from the sisters and kinspeople of the testator and give it to the kinspeople of his widow, who had no claims upon him, either legal, equitable, or natural.* And we are

therefore clearly of opinion that the right of dissent is purely personal to the widow, and does not survive her, and that, even in cases of insanity or other disability, where the application was not made by or on behalf of the widow before her death none can be made or maintained for the benefit of her estate afterwards.''

So that upon the things which should guide the chancellor we may summarize the holdings thus: (1) Whatever is done should be for the best interest of the insane, other and all matters being considered, (2) ''best interest of the insane,'' does not necessarily mean from a pure monetary viewpoint, but other matters must be taken into consideration beyond the mere matter of dollars and cents; (3) her kinsmen have no interest and they should be left out of consideration; (4) the fact that an insane person (permanently so) cannot use money with discretion, and has no need for money or property further than to comfortably care for her in every way, is a matter of consideration; (5) that the right of a testator to dispose of his property as he pleases, so long as he amply provides for an insane wife is a matter for consideration; (6) and that the kinsmen of the wife have no claims either directly or indirectly upon the bounties of the husband, whilst those of the husband have, is also a matter for consideration. There may be others, but certainly from the case law, the foregoing are all matters which should appeal to the chancellor's mind in determining whether or not the will of the husband should be renounced in the best interest of the unfortunate insane wife. Measured by this standard what should be done in the case at bar? A partial answer is found in the language of this court in Young v. Boardman, 97 Mo. l. c. 192:

''The leaning of the courts is in favor of wills. The testator here made ample provision for his wife, and if it devolved upon the courts to exercise the power of election, they would in all probability not disturb the will. But the power to make the election is con-

ferred upon the guardian, and his election, legally made as it is in this case, is final."

In the same case at page 186 et seq., it is further said:

"The clause of section 2194 [R. S. 1879] giving to the guardian the power to elect for his ward is not limited by reference to any section or particular case or cases. It applies to all cases where, under the chapter of the statutes concerning dower, any widow is entitled to the benefit of election. There are other cases besides that where the husband dies without any child or other descendants in which she has an election. Thus she is entitled to make an election where he dies leaving such child, but not by the last marriage. So, too, the widow has the right to take a child's part in lieu of dower. The sections before set out, relating to her right to renounce the provisions of the will, are a part of the Dower Act. They do not, it is true, use the term elect, but say she must, by writing, 'not accept the provisions made for her by said will.' The filing of the declaration under those two sections is but an election not to take under the will. The provisions made for her in the will stand for dower until she declines to accept them. The act of renunciation is an election. Until the Act of February 17, 1865 (Acts of 1864-5, p. 24), the guardian of a minor or insane person had no such power of election. This power was then, for the first time, given to the guardian by way of an amendment to what is now section 2194. No reason is seen why the guardian may not make the election not to accept the provisions of the will as well as in the other cases. The evident object of the amendment was to give him this right in all cases of election provided for in the dower act, including the right and power to 'not accept' the provisions of the will. We cannot see that Bretz v. Matney, 60 Mo. 444, has any bearing upon the present case."

·We have held supra that where the guardian refuses to act as in this case, a court of equity has the power to make the election for the insane widow. The petition in this case is broad enough to authorize the chancellor to elect for the insane widow, either to take under the will or to renounce the will. In other words, under the petition, broad and comprehensive as it is, the chancellor had full power to either say that the widow should take under the will, or to say that she should renounce the will. With this power, what should the chancellor have done? This calls for the facts, which we have detailed. The prime movers in this case are the sisters of the widow, but their mercenary interest should be excluded from consideration. They have no interest which the chancellor could consider. That Mrs. Connor is hopelessly and incurably insane stands out in bold relief upon this record. That she could not use any vast sum of money is equally patent. Her age bespeaks the fact that she is nearing life's journey's end. Her age is not given, or if given we have failed to find it, but she was married not later than 1874, and must be sixty or more in years. The allotted time of three-score and ten is nearly finished. For nearly twenty-five years she has had the faithful and kindly attentions of the Sisters of Charity at St. Vincents. For these long years, the best room in that magnificent institution has been hers, and is the only home which her wandering mind has known. She suffers from no restrictions, save and except those necessary for her own benefit, and the discipline of such an institution. Under its charter "St. Vincents Institute for the Insane" has perpetual life, and there will always be "Sisters of Charity" in this world. The will of Thomas Connor left her at his death in the kindly hands where he had placed her in his life. His constant visits to her there made him to know that she was to be left in kindly hands. It is true that his will says "this devise being in lieu of dower or other in-

terest in my estate and property'' but it also makes ample provisions for all her needs and such comforts as one in her deplorable condition could enjoy. He pledges his whole estate to her, if it be necessary. It is true that it says that $150 per month during life shall be used for ''her care, *comfort* and support,'' but it further says, ''and such other and further sum as it may be necessary to expend in the judgment and opinion of the Sisters of Charity at St. Vincents Institution.'' So that from a financial standpoint ample provision is made for one in Mrs. Connor's position and condition. She is left in charge of one of the best institutions in the land, and in the hands of those whose hearts go out, and for centuries have gone out, to the afflicted of all religious faiths. No other kind of a home would be to the best interest of one afflicted as Mrs. Connor is afflicted. What more could one situated as is she want or need and what more ought a chancellor give? To my mind, nothing more.

The trial court by its final judgment vacated its order and judgment of April 17, 1908, and in so doing its action was correct and should be affirmed. It then dismissed the bill by the next friend of Mrs. Connor. This should not have been done. Under the pleadings and facts the chancellor should have elected for Mrs. Connor to take under the will of her husband, to the end that the rights of all parties might be forever fixed and settled. We will, therefore, reverse the judgment in so far as it dismisses the bill filed by Mrs. Connor through her next friend Jno. B. Cole, and remand the cause, with directions to the circuit court to enter up a new judgment vacating its order and judgment of April 17, 1908, appointing S. H. Claycomb as commissioner to elect for Mrs. Connor, and further ordering and decreeing that it will be to the best interest of Mrs. Connor, under all the circumstances, to take under the will of Thomas Connor, and further by such judgment elect for Mrs. Connor to take under the will

of her husband Thomas Connor, to the end that certified copies of such judgment and decree may be filed both with the probate court of Jasper county and in the office of the recorder of deeds in such county.

Let the judgment *nisi* be reversed and remanded with the directions aforesaid. All concur.