ALICE T. ALLABEN, Appellant, v. ELLA THOMAS SHELBOURNE, CLINTON K. HERBEL and DORIS LEE HERBEL.—No. 40452.—212 S. W. (2d) 719.

Division Two, July 12, 1948.

1206

*Erwin Tzinberg* and *Wm. J. Becker* for appellant.

*Fred J. Hoffmeister, T. Hartley Pollock* and *Fred C. Schillinger* for respondents.

[720] ELLISON, J.—This is a suit in equity brought in the circuit court of St. Louis county by the appellant, Alice T. Allaben, widow of Glenn Shelbourne, deceased, who is hereinafter called "Glenn", against his mother, Ella Thomas Shelbourne; his sister, Doris Lee Herbel; and the latter's husband, Clinton K. Herbel; all defendants-respondents. The suit was to annul and cancel a promissory note for $3,000 due 20 years after date, and twenty annual interest notes for $180 each, and also a deed of trust securing the same, all purporting to have been executed by Glenn to his respondent mother, the respondent sister being named in the deed of trust as trustee. The deed of trust contained the words "grant, bargain and sell," and under Sec's 3407, 3497[1] imported a fee simple title. None of the notes have ever been paid.

[1] All references to our statutes are to R. S. Mo. 1939 and same section numbers in Mo. R. S. A. Italics in quotations are ours unless otherwise noted.

The basic grounds of appellant's suit urged on this appeal are that the notes and deed of trust were forged and without consideration. She further prays that the title to the land encumbered thereby be quieted in her because: the deed of trust was not recorded until over eight years after its date and almost two months after Glenn's death; that she had no actual notice thereof until over two years after his death; and that by mesne conveyances promptly recorded almost six years earlier she and Glenn had become the owners of the land as tenants by the entireties, in consequence of which she stood seized of the title in fee simple upon his death, unaffected by the deed of trust. Also an injunction was prayed against a pending foreclosure under a power of sale in the deed of trust.

The respondents maintain that the disputed notes and the deed of trust were duly executed by Glenn, and that the latter instrument was duly acknowledged by him before a notary public, all as they purported to be. It was respondents' contention that the deed of trust was withheld from recording at Glenn's request. They further asserted all these instruments were supported by a valid consideration, namely money advanced by the respondent mother to Glenn for: the purchase of the land; materials used in improving it; the purchase of an automobile; his personal expenses; and his outlay in a business adventure in California. Still further, respondents charged on information and belief that Glenn had early informed his wife, the appellant, of the existence of the notes and deed of trust, and that she had learned of it in family conferences, particularly one shortly after her husband's death.

At the time of purchase, the land was an unimproved trapezial tract divided into six adjoining lots, numbered 2069-2074, as shown on a plat of Pharoah Valley, Valley Park, a Subdivision in St. Louis County, Missouri, recorded in Plat Book 24, page 5, Recorder's Office. Thereafter, over a period of about four years a four room stone bungalow, two outbuildings and a rock fence were erected on the tract by the physical labor of Glenn and his friends, and with the physical and financial assistance of the appellant and/or his respondent mother, there being a dispute in the evidence as to their respective contributions to the project, and as to its stage of completion when the deed of trust purportedly was given. The instrument recited it covered the lots "with house and appurtenances and all improvements thereon." And across the end of the principal note and each interest note was a recital, in varying phraseology, that it was secured by a deed of trust on the lots and on "house and all improvements," or "all improvements."

The chronology of the principal events was as follows. Glenn bought Valley Park lots No's 2073 and 2074 for $210, with a down payment of $25 and monthly payments of $5, by written monthly installment purchase contract dated June 1, 1935. Lot 2072 was

.bought for $95, with a down payment of $5 and monthly payments of $2, by a similar contract dated June 16, 1935. Shortly thereafter the improvement work was started on these three lots. Lots 2069, 2070 and 2071 were purchased outright for $175 cash on August 12, 1936, [721] and Glenn received a warranty deed therefor that day. The disputed notes and deed of trust here involved were dated September 1, 1936. Appellant and Glenn were married on January 5, 1938 and lived with the respondent mother for fourteen months and then in a separate apartment for four months. The payments on Lots 2073 and 2074 were completed on April 14, 1938, and on Lot 2072 on or about June 2, 1938, and the respective warranty deeds therefor were delivered to him on those dates. On October 24, 1938, appellant and Glenn (while living with the mother) conveyed all the lots to a conduit of title who on the same day reconveyed them to him and her as husband and wife. These deeds were filed for record that day. In July, 1939, the couple moved to the incompleted improvements on the Valley Park lots.

The improvements were completed, or nearly so, by April 24, 1940, when Glenn and appellant jointly borrowed $1600 at 8%, due in three years, evidenced by a principal note and six semi-annual interest notes for $48 each, secured by a "Lewis" deed of trust on the lots, which was promptly recorded. The next month (May) Glenn went to Miami, Florida, with his mother and used most of that money in a building project there, the appellant moving to an apartment in St. Louis and working for a telephone company. Glenn and his mother returned to St. Louis in April, 1941, and he and appellant again resided in the Valley Park bungalow until March, 1942, when they both went to Florida for about six weeks, and then resumed their residence in the bungalow. They lived there for almost two years until April, 1944, when both returned to Florida to live there permanently.

Glenn died there unexpectedly on October 1, 1944, and was buried in St. Louis. Respondents say that in a family conference the latter part of that month or early in November appellant was apprised of the existence of the disputed notes and deed of trust, and by her conduct indicated she already knew of it. At any rate the respondent mother caused the deed of trust to be recorded November 21, 1944. The appellant testified she first learned of the existence of the notes and deed of trust on October 6, 1946, by a letter from a St. Louis realtor with whom she had listed the Valley Park place for sale; that she immediately came to St. Louis by airplane, ascertained the facts and brought this suit on October 10, 1946. Other facts will be stated, as necessary.

The first issue to be considered is whether the $3,000 principal note, the twenty interest notes and the deed of trust were forged. The originals and photostatic copies have been filed here with the transcript. All of them were filled in longhand in ink on printed forms

issued by the Real Estate Printing and Publishing Co., St. Louis, Mo. They were crudely drawn. The longhand part of the deed of trust is interlined in four places, two of these in blacker ink. In two other places words are traced over. The $3,000 principal note and the first fourteen interest notes had originally been dated "July 1, 1936," with interest running from that date, and serially due "July 1" of the proper anniversary years. This was over a year after the contract purchase of the first three lots, but before the last three lots were bought on August 12, 1936. In all these the word "July" was scratched out or overwritten, and the word "Sept" substituted. The deed of trust and remaining six interest notes were correctly dated "Sept. 1, 1936" in the beginning; and the due date of these six notes likewise.was correctly shown as "Sept. 1" of the appropriate anniversary year. This made them all shortly follow the date of purchase of the last three lots, and the deed of trust was added as security for all.

The signature of the party of the first part on the deed of trust is "Glenn T. Shelbourne." An x is marked· in lead pencil under that signature line on the printed form, indicating the deed of trust had been prepared by someone else, who made the x mark to show where the signature should go. All the notes were originally signed "G. T. Shelbourne." On the principal note and the first interest note the first initial "G" of the signature is overwritten "Glenn" in heavier ink. The signatures on the nineteen other notes are unchanged. And as earlier stated, at the left [722] end of each note, where the printed form recites "This note is secured by deed of trust on Lot —— Block ——," the blanks are filled in ink with the lot numbers of the plat and the notation that the deed of trust covered the house and all improvements. All these notes. on their back bear the endorsement of the respondent mother "Ella Thomas Shelbourne."

The deed of trust purports to have been acknowledged on September 1, 1936, by "Glenn T. Shelbourne" as a single man, before Edwin H. Leibinger, then a notary public of the City of St. Louis, Missouri, and also an undertaker. He was likewise a neighbor of the Shelbourne family though not intimately acquainted with them. He testified, identifying the deed of trust and 21 notes, and stating he remembered the occasion of their execution in the kitchen of the respondent mother's home, to which he had been summoned by another neighbor, Mrs. Taylor. She corroborated him on the latter fact, but was not present when the papers were signed and did not testify about that. The notary swore from recollection of the event that the signatures on the deed of trust and notes were Glenn's true signatures, and that he acknowledged the deed of trust before him (the notary). He was interrogated about the interlineations in the deed of trust and the aforesaid changes in date in most of the notes, and was unable to say whether they were made on that occasion, but affirmed it was be-

fore the instruments were signed. Nobody testified who was the draftsman thereof, but obviously they were not in Glenn's handwriting. A note admittedly signed by Glenn, three letters he had written his mother, and a soldier's book Glenn had kept in World War I were introduced for comparison of signatures.

The respondent mother and sister were ruled incompetent to testify concerning the execution and delivery of the deed of trust and notes under the dead man's statute, Sec. 1887, because they were parties thereto, the mother being payee in the notes and beneficiary in the deed of trust and the sister trustee in the latter. Nevertheless the mother was permitted to testify she knew what these instruments were. She was not allowed to state they had been in her possession since the date of their execution; but the court let her say she customarily kept securities of that kind at her home (where appellant and Glenn lived for fourteen months after their marriage) in a brown suitcase which was accessible to all the members of the family; and that the contents thereof were examined by them. This evidence tended to show the notes and deed of trust had been delivered to the mother and that appellant and Glenn knew it. But later the court held the statute precluded the respondent mother and sister from testifying to anything that took place between them and Glenn, or between them and the appellant when Glenn was present; but such testimony as to occurrences when appellant was present and Glenn absent would be competent to prove *notice* to appellant of the existence of the deed of trust and notes before she became a tenant by the entirety on October 24, 1938.

The appellant testified Glenn's purported signatures on the deed of trust and notes were not his, but that the respondent mother's indorsement signatures were "somewhat similar" to his. She further said she knew his signature, and that when the respondent Clinton K. Herbel showed her a "piece of paper" she asked him: "This is the mother's writing on the deed of trust, isn't it?" And Herbel answered "Yes." He did not testify at the trial. She was cross-examined at some length and several of Glenn's admittedly genuine signatures were submitted to her along with others on letters he had written from Florida. On some of these she was not so sure. But she insisted the signatures on the $3,000 note, interest notes and deed of trust were forgeries, and said Glenn always wrote a clear and uniform signature different from the stratched over signatures on these instruments. One witness for appellant, Henry Kunger, on direct examination was shown an admitted signature of Glenn's and then the signature on the $3,000 deed of trust in suit. On comparison he said: "It looks very much like his signature." Being recalled near the end of the trial, and after testifying to his long familiarity with Glenn's signature, he said judging from that standpoint: "I would

say, no, I don't [723] think this is one—before I says it looked like.'' No expert witness testified on the forgery issue.

On all this evidence we hold the appellant did not sustain her burden of proof that the instruments in suit were forged—certainly not to the extent of warranting us in overturning the conclusions of the chancellor below, who saw and heard the witnesses. Sec. 114(d) Civil Code, Laws Mo. 1943, p. 388; Sec. 847.114(d) Mo., R. S. A. While the deed of trust and notes were rather crudely drawn and some of them changed, and they do not appear to have been written in a business office, that fact may, in some degree, argue for their genuineness on the theory that they were unstudied. But even otherwise, from a comparison of the signatures on the disputed instruments and Glenn's admitted signatures we see nothing to convince a non-expert that they were spurious.

Turning now to the appellant's other main contentions: that the deed of trust and notes in suit, executed to the respondent mother on September 1, 1936, were without consideration; and that she (appellant) had no actual notice thereof until over ten years later, on October 6, 1946; also nearly eight years after she had become a tenant by the entirety in the Valley Park place by the quitclaim deeds of October 24, 1938; and over two years after her husband Glenn died on October 1, 1944, when she became the owner of the fee. On these issues it should be noted at the outset that in such fiduciary transactions between husband and wife the wife is entitled to rely on representations made by her husband as to his title and is not required to search the land records for encumbrances thereon, Morris v. Hanssen, 336 Mo. 169, 182(5), 78 S. W. (2d) 87, 94(12).

As against the foregoing contentions respondents first raise a question of law which we must consider here. The two promptly recorded quitclaim deeds, conveying the Valley Park place to appellant and Glenn as tenants by the entireties, both recited a consideration of $1. Respondents assert that was merely a nominal, and not a *valuable* consideration. And for that reason they contend appellant was not a bona fide purchaser, and cannot claim title under the quitclaim deeds as against the respondent mother's prior unrecorded deed of trust—notwithstanding appellant acted in good faith and without notice thereof. This legal contention is good. It is the general rule here and elsewhere that to constitute a bona fide purchase three elements are necessary: good faith, a valuable consideration and absence of notice[2]—of which, according to respondents' theory, the second element is missing. Assuming for the moment that the other two elements are present, the question presented is whether the consideration of $1 recited in the quitclaim deeds is a valuable consideration.

[2] 5 Words & Phrases (Perm. Ed.), p. 628 "Bona Fide Purchaser"; 66 C. J., sec. 906, p. 1092; 55 Am. Jur., secs 685-8, pp. 1066-9; McAboy v. Packer, 353 Mo. 1219, 1224(3), 187 S. W. (2d) 207, 209(1).

A leading case often cited on that question is Strong v. Whybark, 204 Mo. 341, 345, 102 S. W. 968, 969(2), 120 A. S. R. 710, 713, 12 L. R. A. (N. S.) 240, 243. That decision, as reported in our State reports and in A. S. R. and L. R. A., held that a quitclaim deed for a recited consideration of "natural love and affection and five dollars," stated a valuable consideration, and was good as against a prior unrecorded warranty deed of the same land, made by the same grantor to a different grantee. On that point the opinion said: "A valuable consideration is defined to be money or something that is worth money. . . . It is not necessary that the consideration should be adequate in point of value. Although small or even nominal, in the absence of fraud, it is enough to support a contract entered into upon the faith of it. . . . It seems to us that it would be a useless waste of time and energy to cite authorities in support of the proposition that five dollars or any other stated sum of money *in excess of one cent, one dime, or one dollar, which are the technical words used to express nominal considerations,* is a valuable consideration within the meaning of the law of conveyancing."

The words which we have italicised are omitted from the report of the case in 102 S. W. 968, supra. Neither do they appear in [724] the original manuscript opinion on file in this court. But they were quoted by the same author as a part of that decision in citing it less than three years later in Hays v. Pumphrey, 226 Mo. 119, 127, 125 S. W. 1109, 1111. So for present purposes we treat it as holding that a consideration of $1 stated in a deed is a nominal consideration, whereas any money consideration above that, such as $5, would be a valuable consideration—though as to this latter there are numerous authorities to the contrary.[3]

Nevertheless, the consideration recited in a deed is open to parol explanation not contradicting the plain intent and unambiguous contractual stipulations thereof.[4] And while the appellant admitted she actually did not pay Glenn any money for the *deeds* conveying the Valley Park place to her and him as tenants by the entireties, yet she testified she did pay the $10 fee to the conveyancer; that Glenn was out of work and she had been supporting him; and that they were on a share and share alike basis, and he wanted the Valley Park place to be in both their names. But these statements were somewhat ambiguous as to whether the quitclaim deeds were made in consideration of appellant's contributions to the family menagé, or merely as

[3]66 C. J., sec. 932, p. 1107-8; 55 Am. Jur., sec. 736, p. 1102, sec. 737, p. 1103; Biondo v. Biondo (Mo., Div. 2), 179 S. W. (2d) 734, 738(7); Conn. Mut. L. Ins. Co. v. Smith, 117 Mo. 261, 293(7), 22 S. W. 623, 629(3); 38 A. S. R. 656; Campbell v. The Laclede Gas Co., 84 Mo. 352, 365.

[4]32 C. J. S., sec. 950, p. 873; 22 C. J., sec. 1557, p. 1161; 16 Am. Jur., secs. 433-440, pp. 680-685; Robinson v. Field, 342 Mo. 778, 795(7), 117 S. W. (2d) 308; 317-8; Finley v. Williams, 325 Mo. 688, 697(8), 29 S. W. (2d) 103, 106(11).

a voluntary settlement upon her. And her counsel admitted, while the question was under discussion with the court, that "there was no consideration given for it" (the quitclaim deed to appellant) but contended that was immaterial. We do not agree, and in view of this admission must hold no *valuable* consideration was given for the quitclaim deed and that appellant was not a bona fide purchaser under the authorities cited in marginal note 2, supra, and does not have a title superior to the respondent mother's deed of trust.

Returning to appellant's contentions: (1) that she had no actual notice of the deed of trust and notes executed by Glenn to the respondent mother; (2) and that the mother paid no consideration therefor. On the first point, even though it be true that appellant had no knowledge of the existence of the deed of trust and notes, still, since she held title only by quitclaim deed and was not a bona fide purchaser for value, she cannot prevail merely because she was innocent. It seems to us she must stand or fall on the second issue—whether the respondent mother's deed of trust and notes were in fact supported by a consideration. Respondents' answer alleged the consideration was the debt described therein, namely the notes.

This raises another question. Appellant tried the case below not alone on the theory that there was a complete lack of consideration for the deed of trust and notes (as alleged in her petition) but also on the theory that there had been a *partial* failure of consideration—that is to say, that the mother did not furnish Glenn the full $3000 principal secured thereby, and could only recover pro tanto for so much of the advancement as she did make. The appellant offered substantial evidence on that issue; and the respondents offered evidence to the contrary. But when confronted by the dead man's statute, Sec. 1887, rendering the respondent mother and daughter incompetent to testify on the transaction, they made an offer of proof that she paid the full consideration. The fourth point of their brief here says: "The burden of proof was on appellant to show a lack *or failure* of consideration for the deed of trust and notes in question and appellant did not meet this burden." This apparently concedes there was an issue on partial failure of consideration in the case, although the brief also later contends that under Sec. 3040 the secured notes *prima facie* imported a valuable consideration, which appellant did not overcome.

We think appellant is entitled to rely here on this mooted issue of partial [725] failure of consideration although she did not plead it. Under Sec. 37 of our Civil Code, she could have pleaded it as an alternative claim. Laws Mo. 1943, p. 370, Sec. 847.37 Mo. R. S. A. And Sec. 82 of the Code provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." And this is true notwithstanding appellant acquired

title through a quitclaim deed and was not a purchaser for value. While her title was not superior to that acquired by the respondent mother through her unrecorded deed of trust, yet, even if the quitclaim deed was made by Glenn merely as a settlement upon her, that was a good and sufficient consideration to support the conveyance in the absence of fraud against the mother as a creditor, and then only to the extent that her rights were *prejudiced.*[5]

■ There is a mass of fragmentary evidence as to how much money the respondent mother had advanced to Glenn before he executed the $3000 principal note and deed of trust in suit on September 1, 1936. He lived in her home at and prior to that time, but was courting the appellant during that year and until they were married in January, 1938. The respondent mother testified he was out of work in the early '30's, and that she had contributed to his support. She said she went to California with him three times, and worked in offices out there, where Glenn failed in business before 1932. As tending to prove she was able to help him financially the mother testified she had worked for 20 years in an office in St. Louis, and in 1932 inherited about $5900 from a brother in New York, of which she spent about $3300 on her own house, leaving $2600 in free money beside her own earnings, all of which was kept in a checking and a savings account in a St. Louis bank.

On the other hand the appellant testified she was employed when Glenn was courting her in 1936-8, and that he did not lose his job until January, 1939, a year after their marriage. He and she were both working and supporting the mother. His unemployment followed in 1939-40, except for odd jobs. It was in the latter year that Glenn and the mother went to Florida. Further, two witnesses respectively testified Glenn worked two or three years in St. Louis as a truck driver for a coffee company in 1931-2, and in the same capacity for the Wagner Brewery in 1936. Both these men, as friends, had helped Glenn work on the improvements on the Valley Park place on week ends, and their testimony showed the materials therefor were purchased by Glenn piecemeal. Two witnesses said he borrowed small sums of money from them for that purpose. A photograph, dated 1937 longhand, was introduced, showing the improvements then were only in an early stage of construction, indicating the mother could not have furnished much of the funds therefor before September 1, 1936, when the $3000 note and deed of trust were given.

Next, as to the concrete evidence of money advanced by the respondent mother to Glenn before September 1, 1936. She produced a cancelled check for $125 for an automobile purchased for Glenn in 1932, and another check for $175, dated August 18, 1936, representing

the full cash payment for the last three lots purchased. Likewise, three of her checks for $7 each, dated respectively May 5, June 3 and August 25, 1936, were introduced. These represented monthly installment payments of $5 each for the first two lots, and $2 each on the third lot. Also three similar checks for dates after September 1, 1936, were admitted in evidence, but as they postdated the deed of trust and the $3000 note, they should not be considered. However, the documentary evidence shows Glenn made the down payment of $20 on the first two lots, and allowing the mother credit for all the payments shown to have been made by her, it still leaves unexplained $264 of the $480 purchase price of all the lots—over half. The realtor of the vendor company testified it was his recollection that the mother made all the payments on all the lots, part by check and part in cash. But [726] appellant testified that in her presence Glenn gave his mother the cash to make many of these payments as they came due.

In addition to the foregoing, respondents introduced 25 checks signed by the mother and payable to Glenn, totaling $702.63. Of these the earliest (for $450) was dated February 27, 1935, before any of the lots were purchased, and there is no showing as to what it was for. Two of the checks ($3 and $6) postdated the note and deed of trust. Of the antedating checks, two were for fruit trees, one to a Valley Park lumber company, eleven to a fuel oil company and four were cashed by his employer, the Wagner Brewery Company. Likewise 24 checks totaling $444.33 were introduced, signed by the mother and payable either to "self" and self-endorsed, or to "cash", or to a third party payee. The earliest was dated February 1, 1935. The last 14, totaling $130.90 postdated the deed of trust. Two, for small amounts, were to a nursery. Numerous others appeared to be for lumber, hardware, a fuel oil company, or Glenn's telephone bill. But two of the checks, for $110 and $40, were self-endorsed and not shown to have been cashed by Glenn. The aggregate of all the foregoing checks antedating the deed of trust, including that for the automobile and the mother's check payments on the Valley Park lots, was $1327.43.

Also offered were 45 receipted bills totaling $142.05, for materials furnished for the Valley Park house in 1935. The earliest dates of these were June 13 and 15, just after the first lots were purchased, and ran into November. Eighteen were from the Valley Park Lumber Company. Others were from various other materialmen, and two from nurseries. There were sixteen other similar smaller bills for 1936, totaling $86.64. For 1937 there were twenty-six like bills, totaling $152.07, and for 1938 three bills totaling $10.61. The aggregate of all these bills for the four years was $391.37. Subtracting those postdating September 1, 1936, the total is $215.68. But there is no showing as to who paid them, or whether they were paid by some of the checks referred to in the preceding paragraphs. The aggregate

of all the checks and bills antedating September 1, 1936, the date of the deed of trust, is $1543.11—barely one-half of the $3000 note secured thereby. This evidence is not digested in the briefs.

We do not mean to imply the burden of proof was on respondents to show the mother had advanced $3000 to Glenn. On the contrary, the burden was on the appellant to disprove that much was advanced, and as near as may be, how much the mother did advance. But since respondents, in possession of the bank checks and receipts, undertook to make a showing on that question, and were able to account for only half of the amount claimed, an inference against them is warranted, though it must be conceded they were handicapped by the dead man's statute, Sec. 1887.

Respondents say the decree below found the appellant had been advised and did have actual notice of the existence of the $3000 note and deed of trust. We find no such recital in the decree. It merely adjudges these instruments were and are valid. And that ruling may have been made on the theory that they were supported by a valuable consideration, without considering the issue of partial failure of consideration, which was not pleaded. Remembering the tenancy by the entirety quitclaim deeds were executed while appellant and Glenn were living in the mother's home, and were promptly recorded without any effort at concealment, it seems strange that the appellant, if she had knowledge of the prior $3000 note and unrecorded deed of trust in suit, would have joined in the execution of the subsequent Lewis deed of trust and $1600 note bearing 8% interest, in 1940, and thereby have made herself liable thereon; and would have worked to pay off most of the latter indebtedness, as she testified. The record shows most of this money was spent in Florida that same year while Glenn and the respondent mother were there. And it further shows the loan was paid off in two payments, $700 on October 23, 1942, and $927 on March 21, 1943.

We find no error in the trial court's ruling in applying the dead man's statute, Sec. 1887, to the testimony of the [727] respondent mother and sister, the latter being a party to the $3000 deed of trust as trustee. Their testimony was such as the deceased Glenn might have contradicted. And they were *interested.* Darnell v. Darnell (Mo. Div. 1), 174 S. W. (2d) 812, 816(3); 149 A. L. R. 1125. The daughter in her capacity as trustee at least was interested in her commissions from the threatened foreclosure sale, under Sec. 3479.

The decree is affirmed as to the validity of the $3000 note and interest notes, and the deed of trust securing the same, but reversed and remanded for trial on the issue of partial failure of consideration. *Leedy, J.,* concurs; *Tipton, P. J.,* not sitting.