In the Matter of the ESTATE OF Eunice Viola SOPER, Incompetent.

ARCADIA VALLEY BANK, Plaintiff-Respondent,

v.

Elmo BLACK, Administrator of the Estate of Glenn H. Soper, Deceased, Defendant-Appellant,

and

Willa Kusman, Administratrix of the Estate of Eunice Viola Soper, Deceased, Defendant-Appellant,

and

Maynard Faulkner, Jerry Faulkner and Maynard Faulkner and Debra Lynn Owens, Co-Trustees of Glenn H. Soper Trust, Defendants-Respondents.

Nos. 10662, 10663.

Missouri Court of Appeals, Southern District, Division Three.

April 4, 1980.

Motion for Rehearing or Transfer Denied April 22, 1980.

Application to Transfer Denied June 10, 1980.

Robert A. McIlrath, McIlrath & Maynard, Flat River, for defendant-appellant, Elmo Black.

Donald E. Lamb, Centerville, for defendant-appellant, Willa Kusman.

G. C. Beckham, J. Kent Howald, Beckham, Hale & Howald, Steelville, Marvin L. Dinger, Ironton, for defendants-respondents.

HOGAN, Judge.

This appeal is taken from an order and judgment entered by the Circuit Court of Iron County. Plaintiff Arcadia Valley Bank brought this bill of interpleader to determine which of several claims to the assets of Glenn and Eunice Soper should be honored. During his lifetime, Mr. Soper undertook to divide the property he and his wife had accumulated so as to avoid probate. Upon advice of counsel, the division was accomplished by settlement of an inter vivos trust and execution of a postnuptial agreement. In this action, the trial court determined that both instruments were valid. On appeal, the primary questions are: 1) whether the Probate Court of Iron County should have approved the postnuptial settlement; 2) whether the postnuptial settlement was fair and equitable, and 3) whether Mr. Soper's disposition of his assets was the product of undue influence exerted by respondents Maynard and Jerry Faulkner.

Stating the background of the case as straightforwardly as its convoluted nature permits, the record shows that on July 20, 1974, Glenn Soper and his wife Eunice lived in Maywood, Illinois, near Chicago. Mr. Soper was about 82 years of age; his wife was about 86. Both were in poor health. Mr. Soper had emphysema and was sporadically disabled. Apparently, Mrs. Soper had had a stroke; she was aphasic and unable to move about without difficulty. During the early summer of 1974, Mr. Soper had serious physical difficulty and became unable to care for his wife or to keep house. The Sopers had no children, and if Mr. Soper had kinsfolk of any order, they have not appeared. Mrs. Soper, on the other hand, had numerous relatives in Missouri, including two brothers, Henry and Willard Wood. Mrs. Jerry Faulkner, ultimate beneficiary of the trust in issue, is Willard's granddaughter; Maynard Faulkner is her husband.

Having decided he could no longer care for himself and his wife, Mr. Soper called upon the Wood family for assistance. Harrell Wood,[1] Mrs. Faulkner and her husband responded. They found the Sopers ill and unkempt. Mrs. Faulkner decided to take Mrs. Soper to the Faulkner home at once; Mr. Faulkner, Harrell and Mr. Soper remained behind to attend to details.

Harrell and Mr. Faulkner shortly discovered that the Sopers had accumulated more than $170,000 in savings and that Mr. Soper had the passbooks scattered about his house. In addition, Mr. Soper had more than $21,000 in cash and negotiable instruments cached upon the premises. Inferably upon Mr. Soper's instruction or with his consent, Mr. Faulkner returned at once to Missouri with the cash and the passbooks. Mr. Faulkner then went directly to the plaintiff bank and opened a checking account in the amount of $6,269, established a passbook savings account in the amount

---

1. The name is spelled "Harrell" in the transcript; some of the exhibits indicate Mr. Wood's first name is "Harold."

of $5,000 and purchased a $10,000 certificate of deposit, all in the names "Glenn H. Soper or Maynard Faulkner, or the survivor of them."

Shortly thereafter, the Sopers were installed in the Faulkner residence at Belleview, in Iron County. In August and September 1974, the Illinois savings accounts were transferred to the joint checking account which Mr. Faulkner had established. By September, the balance of the account had grown to (approximately) $200,000. From late September to the middle of December 1974, about $75,000 was invested in certificates of deposit made payable to Mr. Soper or one of the Faulkners; at the time the postnuptial contract was approved in December, a little more than $100,000 was paid to Mrs. Soper's guardian from the checking account. At the time of trial in September 1976, a balance of about $5,000 remained in that account.

Needless to say, the other members of the Wood family objected to the Faulkners' taking charge of the Sopers and their assets. They regarded the Faulkners' conduct as officious and overreaching and on several occasions, protested. Resort to the courts commenced after a confrontation between the Faulkners and two of Mrs. Soper's nieces—and the nieces' husbands—on August 11, 1974. Mrs. Naomi Cole (Henry Wood's daughter) and Mrs. Alta Sellers (Willard Wood's daughter; Jerry Faulkner's aunt), together with their husbands, called upon the Faulkners that day. Both nieces and their husbands were concerned that if all the Soper assets were transferred to the joint checking account, their aunt (Mrs. Soper) might be left without any means of support. In substance, they suggested that Mr. and Mrs. Soper should live with one or another of Mrs. Soper's other kinsfolk, and that Mr. Faulkner should divest himself of any interest in the Sopers' money. Mr. Faulkner rejected this suggestion.

On August 28, 1974—17 days after this confrontation—Henry and Willard Wood petitioned the probate court to declare both Sopers incompetent and to appoint a guardian of the person and the estate for each.

In the meantime, Mr. Soper took counsel with Mr. G. C. Beckham, an attorney whose office is at Steelville. Early in the evening of August 12, 1974, Mr. Soper conferred at length with Beckham. According to Beckham, Mr. Soper wanted to divide the Soper assets so as to exclude the Wood family, to care properly for his wife, and to avoid probate. Soper also wanted Mrs. Faulkner to receive the residue of the Sopers' money after the death of the survivor. Mr. Soper believed his wife's brothers would try to have him and his wife declared incompetent. Beckham gave as his preliminary opinion that Mr. Soper probably could not prevent the Wood family from inheriting some of the money, but could probably accomplish his purpose by "tak[ing] a reasonable amount of [the Soper assets] and [putting] it in a trust." Beckham agreed to consider the details and contact Mr. Soper later. Mr. Beckham became ill, and was unable to attend to business until September 1.

Beckham associated Mr. Marvin Dinger, an attorney with offices at Ironton. The probate court set a hearing on the question of Mrs. Soper's incompetence for September 24. Before the hearing, Beckham and Dinger conferred with Mr. Soper in Dinger's office. The three men again discussed disposition of the Soper assets. Beckham and Dinger recommended that Mr. Soper obtain an order from the probate court permitting him to dispose of half his assets without his wife's consent—by means of the trust—and that with the court's permission, he execute a postnuptial settlement with Mrs. Soper's guardian. The specific purpose of the contract would be to effect a mutual waiver of property rights by the Sopers. Each spouse was to receive approximately one-half the Sopers' assets. Mr. Soper objected, saying he saw no reason to give half of "his" money to his wife's guardian, but he reluctantly agreed to this disposition.

The hearing was then held. In the presence of Mr. Soper's attorneys, Mr. Frank Mack, an attorney, various members of the Wood family, and Mr. Robert Carr, an at-

torney who represented Henry and Willard Wood, the possibility of executing a postnuptial agreement was discussed. The probate judge requested that the requisite documents be presented to him. Beckham took time to prepare the instruments he considered necessary and on October 4, he, Mr. Soper and Dinger again met in Dinger's office. On this occasion, the postnuptial contract, the proposed trust instrument, a proposed will and a petition requesting approval of the postnuptial settlement had been prepared. The corpus of the trust had not been designated because it was necessary to obtain the specific description of the items which were to constitute the corpus of the trust; otherwise the instruments were complete. The integrated transaction was discussed with Mr. Soper; Mr. Soper approved, and the postnuptial settlement was filed with the probate court. On December 12, the court entered an order of record approving the settlement.

On December 13, 1974, the inter vivos trust which Beckham had prepared was filed in the probate court, together with a will which substantially duplicated the provisions of the inter vivos trust by means of a testamentary trust. These two instruments were executed while Mr. Soper was a patient in the Mineral Area Osteopathic Hospital at Farmington. The general terms of the trust had been discussed on several occasions by Mr. Soper, Dinger and Beckham, but the specific items which were to become the corpus of the trust—the certificates of deposit, for the most part—had not been designated. On December 13, Dinger went to the hospital, again read the inter vivos trust and the "covering" will to Mr. Soper, and Mr. Soper signed those documents. The amount settled upon trust came to about $93,000; more than $100,000 had been paid to Mrs. Soper's guardian under the terms of the postnuptial settlement. The Wood family persevered; a week after the inter vivos trust was filed, Henry and Willard Wood moved the probate court to set aside its approval of the postnuptial settlement. Dinger and Beckham promptly moved to dismiss their motion on the ground that Henry and Willard lacked the capacity to sue.

Mr. Soper was again hospitalized on January 3 or 4, 1975. It is conceded that on this occasion, Mr. Soper was seriously ill, and this particular hospitalization touched off a flurry of legal activity. Mrs. Cole, one of the nieces previously mentioned, visited Mr. Soper on January 4. On January 5, Mrs. Cole, her husband, and one Art Kusman (Mrs. Faulkner's uncle), together with Mr. Hugh Roberts, an attorney, appeared at the hospital. Mr. Roberts had prepared a new and different will, a general power of attorney, and letters discharging Dinger and Beckham. Whether Mr. Soper asked to have these documents prepared or whether they were the product of undue influence and misrepresentation on the part of Mr. and Mrs. Cole was one of the issues tried. The trial court's finding—it appears of record as Conclusion of Law No. 4—was that the documents executed on January 5 were procured by an attempt to exert undue influence and to perpetrate fraud, but on this appeal it is unnecessary to review that particular finding. The second will *may* have been admitted to probate, and there may be some devisable assets left over and above the assets of the inter vivos trust; nevertheless, if the inter vivos trust is valid, then Mr. Soper's assets subject to devise or bequest are relatively insignificant.

On January 6, 1975, the probate judge felt compelled to visit Mr. Soper in the hospital. The judge was accompanied by Mr. Dinger and Mr. Roberts. According to the judge, Mr. Soper was "very weak," but he nonetheless "knew where he was, . . recognized people and the few remarks he made were entirely coherent." At this point, the contending parties seem to have been passing each other in the hospital corridors; Mrs. Cole testified she saw Mrs. Faulkner, Dinger, Roberts and the probate judge in the hospital on January 6.

In any event, Roberts entered an appearance in the probate court on behalf of Mr. Soper in Mr. Soper's incompetency proceeding on January 6, 1975, and on January 8, entered his appearance on Mr. Soper's behalf in Mrs. Soper's incompetency proceed-

ing. No guardian of Mrs. Soper's person had been appointed; Mr. Roberts petitioned the probate court for the appointment of a guardian of her person.

On January 10, a hearing was held in the incompetency proceeding pending against Mr. Soper. Mr. Roberts, Mrs. Soper's guardian and an attorney representing Henry and Willard Wood appeared. No notice of this proceeding was given to Dinger, Beckham or to Mr. Soper. Mr. Soper was declared incompetent, despite the fact that on January 9, Mr. Soper had revoked the power of attorney which he delivered to Mr. Roberts on January 5.

The next day, the probate court held a hearing on Henry and Willard Wood's motion to set aside the postnuptial contract. Again, no notice was sent to Dinger or Beckham; Roberts, Mr. Gary Black, an attorney, and Mrs. Soper's guardian appeared. Mr. Roberts, again acting on Mr. Soper's behalf, and Mr. Black, representing Mrs. Soper's brothers, jointly asked that the postnuptial settlement be set aside because ". . . it authorized and directed [Mrs. Soper's] guardian to perform acts which the probate court has no power to authorize. . . ." It is most important to note that the transcript furnished by the probate court recites that the order approving the postnuptial settlement was set aside because the court lacked jurisdiction to enter it. During the trial, the probate judge was permitted to testify and expand somewhat on his reasoning, but it nevertheless appears that he acted in the belief that Mrs. Soper's right to her statutory allowances from her husband's estate was personal to her and could not be waived by a guardian. On January 17, the Faulkners appealed from the order setting aside the postnuptial settlement. The appeal was taken without supersedeas, which under former § 472.230, RSMo 1969, brought only the order of January 11 before the circuit court as a probate matter.

It probably should be noted that on January 13, the probate court appointed Mrs. Soper's guardian to be guardian of her person as well as her estate and allowed him to place her in a "nursing home." Mr. Soper joined her there on January 29, 1975. Mr. Soper died February 4, 1975; on motion, appellant Black, Mr. Soper's administrator, was substituted as an interpleaded party. Mrs. Soper died about a year later. Other facts will be noted in the course of the opinion.

■ This case was submitted on September 7, 1976. On March 15, 1977, the trial court filed extensive findings of fact and conclusions of law and entered its order and decree. Three salient findings of fact must be noted. First, the trial court found that the probate court's order setting aside its approval of the postnuptial settlement was procured by fraud and should be set aside. The trial court also found that the contract was fair and equitable and was not in fraud of Mrs. Soper's marital rights. Accordingly, the order was set aside, leaving the postnuptial settlement in force. Further, the trial court found that the inter vivos trust was not settled in fraud of Mrs. Soper's rights; that Mr. Soper was competent at the time the trust was settled, and that the division of the Soper assets was not the product of undue influence exerted by the Faulkners. The trial court also found Mr. Faulkner to be the owner of the balance remaining in the joint checking account and found that that account was not the product of undue influence. The trial court also ordered the trust terminated and further ordered that the balance remaining in the joint checking account be paid to Mr. Faulkner. As the case is factually diffuse, a number of complex questions of law are suggested; nevertheless we should and shall consider only those questions essential and necessary to an orderly disposition of the appeals. See *Bloomfield Reorganized School Dist. No. R–14 v. Stites*, 336 S.W.2d 95, 97 (Mo.1960); *Southwest Engineer. Co. v. Reorganized Sch. Dist. R–9*, 434 S.W.2d 743, 746 (Mo.App.1968). If the findings we have recited represent correct conclusions, they effectively dispose of the appeals. In this connection, it must be borne in mind that in reviewing a bench-tried case, an appellate court will not disturb a correct

decision simply because the trial court gave a wrong or insufficient reason for its conclusions. *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318[12] (Mo.banc 1964); *Brown v. Montgomery*, 354 Mo. 1041, 1050, 193 S.W.2d 23, 27[3] (1946); *Holland Banking Co. v. Republic Nat. Bank*, 328 Mo. 577, 589, 41 S.W.2d 815, 820[8] (1931); *Dill v. Poindexter Tile Company*, 451 S.W.2d 365, 370[5] (Mo.App.1970).

Preliminarily the points raised by appellant Elmo Black must be considered. Mr. Black is administrator of the Estate of Glenn Soper, deceased. He was substituted as a party upon Mr. Soper's death. Appellant Black has briefed and argued two points on appeal. Both have to do with the application and effect of § 491.010, RSMo 1978, the "Dead Man's Statute." The substance of appellant Black's argument is that neither Mr. Faulkner nor Mr. Beckham should have been permitted to testify to his dealings with Mr. Soper during Mr. Soper's lifetime.

■ The assignment concerning Mr. Faulkner's testimony is oversimplified. There were at least three "transactions" in issue: the joint bank account, the inter vivos trust, and the postnuptial settlement. The measure of Mr. Faulkner's disqualification was different as to each transaction. Indeed it is not clear whether counsel sought to invoke the first ("transaction") or the second ("administration") of the two disqualifying provisos of § 491.010. The point need not detain us. There is other evidence which supplies the proof furnished by Mr. Faulkner's testimony, and the trial court's error in permitting him to testify, if any, is therefore harmless. *In re McMenamy's Guardianship*, 307 Mo. 98, 129, 270 S.W. 662, 672[15] (banc 1925); *Bildner v. Giacoma*, 522 S.W.2d 83, 89[10] (Mo.App. 1975).

As stated in his brief, appellant Black's objection to Mr. Beckham's testimony is that Mr. Beckham was attorney of record for Mr. Faulkner at the time of trial. Appellant Black argues that the Faulkners had a present, actual and vested interest in the trust and that Mr. Beckham undoubtedly sought compensation for his services as an attorney. Therefore, the argument runs, Mr. Beckham was an interested party. We are cited by appellant Black and the respondents to *Allen v. Jessup*, 192 S.W. 720 (Mo. 1917).

■ The point has not been briefed carefully enough to permit adequate review. If, as appellant Black argues, we assumed that the inter vivos trust was "negotiated" by Mr. Beckham, acting for Mr. and Mrs. Faulkner—such is not the case— then Mr. Soper's death would not have barred Mr. Beckham's testimony. The death of the other negotiating party in such case does not disqualify the negotiating agent. *Bernblum v. Travelers Ins. Co. of Hartford, Conn.*, 340 Mo. 1217, 1226, 105 S.W.2d 941, 945 (banc 1937), and see Comment, Waiver of the Dead Man's Statute, 39 Mo.L.Rev. 218, 221 (1974). However, we find no indication that Mr. Beckham acted as a negotiating agent for Mr. and Mrs. Faulkner in preparing the trust agreement. Rather, the record makes it appear that in drawing up the inter vivos trust, in preparing the postnuptial settlement and a will, which for the most part duplicates the provisions of the inter vivos trust, Mr. Beckham was acting solely as Mr. Soper's attorney. The cases cited by appellant Black are wholly inapposite. In *Allaben v. Shelbourne*, 357 Mo. 1205, 212 S.W.2d 719 (1948), the ultimate beneficiaries were held disqualified by interest under § 491.010, but again, it does not appear that Mr. Beckham acted as their agent in preparing the inter vivos trust agreement. *Allen v. Jessup*, supra, 192 S.W. at 722, held that a husband was disqualified under § 491.010 because at the time he purported to act as his wife's agent in dealing with a deceased party, he had a secret, actual and vested interest in the transaction. As far as we can determine from the record, the only interest Mr. Beckham had in the whole transaction was an interest in being compensated as an attorney. That interest was not such as to disqualify him under § 491.010. *MacDonald v. Tittmann*, 96 Mo.App. 536, 542, 70 S.W. 502, 504 (1902); Comment, The "Dead

Man's Statute" in Missouri, 23 Wash.U.L.Q. 343, 350 and n. 46 (1938). Mr. Beckham was not an incompetent witness for any reason assigned by appellant Black.

The points briefed and argued by appellant Willa Kusman are somewhat more complex.[2] Mrs. Kusman has briefed and argued five diffuse points. Ordinarily, those points would be considered seriatim as presented, but such consideration in this case would prolong the opinion unconscionably. The substance of Mrs. Kusman's appeal can be fairly reduced to three propositions: 1) That the postnuptial agreement, which counsel consistently refers to as the "50–50" contract, was invalid because: a) it was essentially in fraud of Mrs. Soper's marital rights; b) Mrs. Soper's guardian had no authority to execute it, and c) the contract was not fair and reasonable; 2) That the division of assets was void because it was the product of undue influence, and 3) The trial court erred in declaring that the balance remaining in the joint checking account at Mr. Soper's death was Mr. Faulkner's property, and the account should have been impressed with a resulting trust.

The first proposition gives us little difficulty. The contract before us is a postnuptial agreement in which each spouse undertook to renounce *all* rights which each might have in the property of the other as surviving spouse. Contracts between competent spouses which are in effect mutual waivers in the estate of the other are now governed by statute. *Estate of Youngblood v. Youngblood*, 457 S.W.2d 750, 754–755 (Mo.banc 1970); *In re Adelman's Estate*, 377 S.W.2d 549, 553[5] (Mo.App.1964). While the confused record before us indicates that Mr. Soper may have executed two wills, and that one or another of them may have been admitted to probate, Mr. Soper's proposed disposition of the Soper

assets contemplated an intestate estate. Therefore the statute authorizing the "50–50" contract is § 474.220, RSMo 1978. *In re Adelman's Estate*, supra, 377 S.W.2d at 553[5]. In material part, that statute reads:

"The right of election of a surviving spouse hereinbefore given may be waived *before or after marriage by a written contract, agreement or waiver* signed by the party waiving the right of election . . . ." (emphasis added)

This statute is § 39 of the Model Probate Code, adopted as part of the Probate Code of 1955. Laws of Mo.1955, p. 385, § 258. The Model Probate Code treats both antenuptial and postnuptial property settlements as waivers of the right to elect, transactions having their origin in common law contracts to bar dower. See *Estate of Youngblood v. Youngblood*, supra, 457 S.W.2d at 754–755. At common law, the execution of valid postnuptial property settlements was hindered by the jointure requirements of the Statute of Uses and the incapacity of the spouses to contract inter sese, but such contracts are generally recognized nearly everywhere in the United States today.[3] It is worth noting that historically, spouses' mutual waivers of property rights in the estate of the other were regarded as "equitable" contracts.[4] Our courts have for many years recognized the validity of postnuptial property settlements comparable to the "50–50" contract, provided: there is consideration, the agreement of the parties is fair and just, and the intention of the parties is clearly expressed. *In re Wood's Estate*, 288 Mo. 588, 232 S.W. 671 (banc 1921); *McQuate v. White*, 389 S.W.2d 206, 211[3] (Mo.1965); *Glauert v. Huning*, 290 S.W.2d 126, 131–132 (Mo.1956); *Clark v. Clark*, 228 S.W.2d 828, 830–831 (Mo.App. 1950); *Hall v. Greenwell*, 231 Mo.App. 1093, 1106–1108, 85 S.W.2d 150, 155–156 (1935).

2. Mrs. Soper died March 28, 1976. Mrs. Kusman was appointed administratrix of her estate and prior to trial was substituted as a party, replacing Mr. Mack, who had acted her guardian.

3. See, generally, Annot., 9 A.L.R.3d 955 (1966); 1 American Law of Property, § 5.40 (Casner ed. 1952).

4. See Restatement of Property, § 316, comment (c), (1940), to which the editorial comment on § 39 of the Model Probate Code refers; see also Ronken, Ante-Nuptial Contracts; Their Origin and Nature, 24 Yale L.J. 65, 70, citing *Naill v. Maurer*, 25 Md. 532, 539 (1866).

We must, of course, consider the fact that Mrs. Soper was admittedly incompetent when the postnuptial settlement was executed, but her incompetence was not an insuperable obstacle to the execution of the agreement. As the authorities noted and discussed hold, the "50–50" contract, from her point of view, was in essence a species of waiver of the right to elect. Our courts have consistently recognized the power of a court of equitable jurisdiction to make an election for an incompetent spouse either to accept or to renounce the provision made for her in lieu of her marital property rights. This jurisdiction is independent of the statutes. *Manufacturers Bank & Trust Co., Etc. v. Kunda*, 353 Mo. 870, 185 S.W.2d 13 (1945), and Annot., 21 A.L.R.3d 320, 351–353 (1968). The "50–50" agreement came before the probate court in the course of the administration of the estate of an incompetent. Section 472.030, RSMo 1969, now repealed, conferred full equitable powers upon the probate court to effectuate its jurisdiction over Mrs. Soper's estate. *In re Myers' Estate*, 376 S.W.2d 219, 224 (Mo. banc 1964). Therefore contrary to the probate judge's second thought, he had plenary jurisdiction to approve the postnuptial agreement. Section 475.135, RSMo 1978, expressly provides that a guardian may contract for his ward with the approval of the probate court, and § 474.150(3) provides that conveyance of the property of the spouse of an incompetent person will not be deemed in fraud of the incompetent's marital rights if the probate court authorizes the guardian to make the conveyance and finds the conveyance is not in fact in fraud of the incompetent spouse's marital rights. So, if the probate court properly exercised its jurisdiction on December 14, 1974, when it approved the postnuptial settlement, appellant Kusman's arguments that the guardian could not enter into any postnuptial settlement and that the agreement was in fraud of Mrs. Soper's marital rights have no merit.

Looking first to the requirements of any postnuptial settlement of property rights, i. e., that there be consideration for the agreement, that the intention of the parties be clearly expressed, and that the agreement be fair, and just, *McQuate v. White*, supra, 389 S.W.2d at 211[3], we readily find consideration sufficient to support the agreement. Each spouse, in redundant terms, released all interest in the property assigned to the other. It was the clear intent of the parties that the agreement should be binding on their heirs, legal representatives and assigns. The mutual releases constituted consideration. *McQuate v. White*, supra, 389 S.W.2d at 212; *Hall v. Greenwell*, supra, 231 Mo.App. at 1107, 85 S.W.2d at 155[4]. The "50–50" contract also expresses the parties' mutual intentions to release all matured and expectant claims against the share set off to the other; in floridly redundant language, each spouse releases all claims against the property of the other.

The question whether the contract was fair and reasonable is as easily resolved. For the purpose of reviewing this point, we accept appellant Kusman's figures. When Mr. Soper asked for assistance in July 1974, he and his wife had accumulated savings in the amount of $173,113.38. Mr. Soper also had in his possession $20,086 in cash and negotiable instruments ("uncashed checks") in the amount of $1,377.56. The whole amount, by our calculation, came to $194,576.73. Five of the savings accounts were payable to Eunice Wood or to Eunice Soper; these accounts totalled $72,522. Two savings accounts, one of which amounted to $9,799.90, the other to $11,817.85, were payable to Glenn Soper. Four savings accounts which in sum came to $56,085.05 were payable to Glenn H. or Eunice V. Soper; one account in the amount of $22,180.22 was payable to Mrs. Eunice Soper, Trustee. In the fall and winter of 1974, the Soper assets were transferred to Missouri. The balance in the joint checking account came to "about" $200,000.

When the joint checking account was opened in August, Mr. Faulkner purchased a certificate of deposit issued by the plaintiff bank in the amount of $10,000. Thereafter and up to December 14, 1974, four additional certificates of deposit issued by

the plaintiff bank were purchased with funds drawn out of the joint checking account. One certificate of deposit issued by the Belgrade State Bank was purchased September 24, 1974. Three of the certificates issued after July 24, 1974, were purchased with checks signed by Mr. Soper; two were purchased with checks signed by Mr. Faulkner. The certificate of deposit issued by the Belgrade State Bank was made payable to Glenn H. Soper and/or Jerry Faulkner; the other certificates were made payable to Mr. Soper or one or another of the Faulkners, either of them or the survivor. The total face amount of these certificates came, by our calculation, to $85,000.

Mr. Soper told Beckham, at their first meeting, that his assets consisted of a joint bank account, and indicated that at that time, there was about $170,000 in the account. Soper said he wanted to exclude the Wood family from inheriting any of the money, and it was only after several conferences with Beckham and Mr. Dinger that Mr. Soper was persuaded to put about one-half the assets in an inter vivos trust and give one-half the assets to his wife, free of all claims on his part. By our calculation, the total amount set aside for the inter vivos trust was $93,088.64. The amount paid to Mrs. Soper's guardian as proceeds of the postnuptial agreement, after it was initially approved by the probate court, was $100,057.73. In some manner, $8,826.37 of this amount was consumed during Mrs. Soper's guardianship, but upon final settlement, $91,231.36 was transferred to appellant Kusman as administratrix. We should note that the inter vivos trust authorized the trustees to invade the corpus of the trust for Mrs. Soper's benefit, should the funds set aside to her be exhausted before her death.

 Such marginally admissible and relevant evidence as was produced to show the source of the Soper assets indicates that only Mr. Soper was ever employed. We have looked to the Illinois law in an attempt to determine whether the form of the passbook accounts establishes ownership. We do not find that it does. Illinois does indeed have a Joint Rights and Obligations statute, S.H.A. ch. 76, § 2(c), which acquits or discharges savings and loan associations upon payment to either holder of a joint savings account, and this statute has been held to create property rights. Nevertheless, what appears to us to be the controlling decision in this case, *Murgic v. Granite City Trust & Savings Bank*, 31 Ill.2d 587, 202 N.E.2d 470, 472[1] (1964), indicates it is the agreement or instrument creating the joint account which "speaks the whole truth." There is recent and respectable authority indicating that making an account payable to one or another of two persons "as joint tenants" would not of itself create a presumption of donative intent. *In re Estate of Baxter*, 9 Ill.App.3d 92, 291 N.E.2d 851, 853[6] (1973). None of the instruments or agreements creating the Soper savings accounts were offered or even mentioned. The burden of showing the agreement was unfair was on appellant Kusman, who sought to invalidate it. *McQuate v. White*, supra, 389 S.W.2d at 212[7]. Mr. Soper gave half his assets to his wife; he retained about one-half, providing that his half might be used for Mrs. Soper's benefit if necessary. Manifestly, it cannot be said the agreement was unfair or inequitable. Considered in light of the factors enumerated in *Manufacturers Bank & Trust Co., etc. v. Kunda*, supra, 353 Mo. at 874, 185 S.W.2d at 14[1], and in *In re Connor's Estate*, 254 Mo. 65, 93, 162 S.W. 252, 260 (1913), the postnuptial settlement was in Mrs. Soper's best interest; the probate court not only had jurisdiction to approve the division of property, it should have done so. We conclude the trial court reached a correct conclusion in holding that the probate court's order of January 11, 1975, setting aside its approval of the postnuptial settlement, was improper and should itself be vacated. As noted, it is of no consequence on this appeal that we reach that conclusion on a basis different from that stated by the trial court.

 The second proposition advanced by appellant Kusman is that Mr. Soper's divi-

sion of the Soper assets was the product of undue influence exerted by the Faulkners. For our purposes, "undue influence" may be defined as that influence which, by force, coercion or overpersuasion destroys the free agency of the grantor, settlor or donor to act. *Davis v. Pitti*, 472 S.W.2d 382, 387[6] (Mo.1971); *Wilhoit v. Fite*, 341 S.W.2d 806, 813[1] (Mo.1960); *Houghton v. West*, 305 S.W.2d 407, 412[4] (Mo.1957). Usually, the question of undue influence arises in cases where the grantor, settlor or donor has made a gift or executed a conveyance to some person who stands in a "confidential relationship" to the grantor, settlor or donor, *Wilhoit v. Fite*, supra, 341 S.W.2d at 813; *Snell v. Seek*, 363 Mo. 225, 233, 250 S.W.2d 336, 341–342[5] (1953), but in cases involving the exercise vel non of undue influence, "[f]actual situations are subject to such a myriad of variations that any one case is of limited precedential value." *Matthews v. Turner*, 581 S.W.2d 466, 472 (Mo. App.1979).[5]

■ Looking to the whole record, it appears that the Sopers had accumulated cash in the amount of $200,000. The inter vivos dispositions which Mr. Soper attempted to make divided the assets roughly in half. One-half was given to Mrs. Soper; the other half became Mr. Soper's separate property. Most of Mr. Soper's assets were conveyed to Mr. Soper and Mr. Faulkner in trust. The conditions of the trust were that during Mr. Soper's lifetime, he was to receive the net income from the trust; if the net income was not ample to support him and pay his medical bills during his lifetime, then the corpus might be invaded; if the provisions made for Mrs. Soper were insufficient, then the trustees were authorized to invade the corpus of the trust "to properly and adequately support and maintain the said Eunice Viola Soper during her lifetime." Upon the death of both Sopers, the entire trust assets were to pass to Mrs. Faulkner, free of trust. The provisions of the postnuptial contract have already been

sufficiently recited. We note appellant Kusman does not undertake to attack only the inter vivos trust as the product of undue influence, although trusts procured by undue influence may be set aside, 1 G. Bogert, Trusts and Trustees, § 44, pp. 303–304, and authorities cited n. 65; she attacks the division of property generally.

It may be conceded that the trial court could have found undue influence on the Faulkners' part. There is no question that Mr. Soper relied upon and trusted Mr. Faulkner with the handling of property and business affairs, thereby creating a sort of fiduciary obligation on Mr. Faulkner's part. See *Davis v. Pitti*, supra, 472 S.W.2d at 388; *Flynn v. Union National Bank of Springfield*, 378 S.W.2d 1, 10–11[14], and cases cited n. 13 (Mo.App.1964). The Faulkners had the opportunity to influence Mr. Soper in the disposition of his property; they were, at least for a time, unwilling to have anyone else care for the Sopers, and almost one-half the entire cash estate went to Mrs. Faulkner. However, there is evidence mitigating against the conclusion that Mr. Soper's division of his assets was the result of undue influence; the exercise vel non of undue influence was a factual issue here, and so we only have to determine whether an examination of the whole record creates a "firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976).

Sometimes it is said a gift by deed, will or otherwise to one standing in a confidential relationship creates a "presumption" of undue influence. *Davis v. Pitti*, supra, 472 S.W.2d at 388, *Flynn v. Union National Bank of Springfield*, supra, 378 S.W.2d at 10[10–12]. It seems to us that the so-called "presumption" is really a doctrine of permissible inference, C. McCormick, Evidence, § 342, p. 803 (Cleary ed. 1972), but in any event there was rebuttal evidence here, so the question became one of fact for resolution by the trial court. *Flynn v. Union National Bank of Springfield*, supra, 378 S.W.2d at 10, and authorities cited n. 11.

---

5. Those interested, if any, in general discussions of "undue influence" and its application to inter vivos transactions may find them in D.

Dobbs, Remedies, § 10.3, pp. 676–678; Note, 41 Col.L.Rev. 707 (1941).

One factor to be considered in determining whether the "presumption" has been rebutted is whether the donor, settlor or grantor was susceptible to undue influence because of his diminished mental capacity or physical dependence on the donee or beneficiary. *Davis v. Pitti*, supra, 472 S.W.2d at 387. Certainly Mr. Soper was physically dependent upon Mr. and Mrs. Faulkner, but there is much credible evidence that he retained his faculties during the whole period in question. There was evidence pro and con, of course, but Beckham testified he had a general conversation with Mr. Soper before the two began discussing business at their initial conference on August 12, 1974. Mr. Soper recalled the distant past, including an acquaintance with Beckham's relatives who lived near Viburnum. Beckham was also certain that Mr. Soper was in full command of his mental faculties when he and Mr. Dinger conferred about the property division on October 4. Witness S. D. Warford was of the view that Mr. Soper was rational and competent when he signed the trust agreement on December 13, 1974. The trial court could have believed these witnesses and could have concluded that Mr. Soper was rational and competent when the division of assets was made.

Another factor which weighs in favor of the trial court's conclusion is that Mr. Soper had the benefit of competent and independent advice from disinterested attorneys. The benefit of competent and independent advice is certainly not conclusive in this State, but it is a factor to be considered. *Pasternak v. Mashak*, 428 S.W.2d 565, 570[12, 13] (Mo.1967); *Cuthbert v. Heidsieck*, 364 S.W.2d 583, 588 (Mo.1963); *Drake v. Greener*, 523 S.W.2d 601, 606[5] (Mo.App. 1975). See also, Note, supra, 41 Col.L.Rev. at 715. On the basis of Mr. Beckham's testimony, the trial court might well have concluded that Mr. Soper simply meant to leave all his money in the joint checking account and the certificates of deposit held jointly with the Faulkners and to trust the Faulkners to care for Mrs. Soper upon his death. And, when the proposed disposition of the Soper assets was first discussed by Mr. Soper and Mr. Beckham, the Faulkners were excluded from the conversation at Beckham's request. There was evidence that Beckham, Dinger and Mr. Soper went over the division of assets on several occasions; on each such occasion, Mr. Soper agreed to abide by the division Beckham and Dinger had proposed.

Additionally, Mr. Soper's disposition of his assets was not forced or unnatural. Where there are only collateral heirs, our courts have no inclination to look sourly on the preference or exclusion of one collateral relative over another. *Hedrick v. Hedrick*, 350 Mo. 716, 726, 168 S.W.2d 69, 74 (1943). To reiterate, the exercise vel non of undue influence is usually a matter of inference from all the relevant circumstances; because examination of the whole record creates no "firm belief" in our minds that the trial court's judgment on this point was wrong, we affirm.

The final proposition put by appellant Kusman need not detain us long. She argues that the balance remaining in the joint checking account should have been impressed with a resulting trust. We are in doubt that as administratrix she stands "aggrieved" by the trial court's decision. Even if we overlook this consideration, it must be remembered that the postnuptial agreement was binding upon and excluded all Mrs. Soper's heirs from inheriting any part of the money set aside to Mr. Soper. Having concluded the postnuptial settlement was valid and should have been approved, we must also conclude that Mrs. Soper's administratrix had no valid claim upon the money remaining in the joint checking account.

For the reasons indicated, the judgment is in all respects affirmed.

FLANIGAN, C. J., and BILLINGS, J., concur.